**MacMILLAN COMPANY**

v.

**I.V.O.W. CORPORATION**
**and**
**William Szirbik, Individually.**
Civ. A. No. 73–323.

United States District Court,
D. Vermont.

June 25, 1980.

---

Philip R. Rosi, Kristensen, Cummings, Rosi & Murtha, Brattleboro, Vt., for plaintiff.

Peter Banse, Rutland, Vt., for defendants.

Rolf M. Sternberg, Hoosick Falls, N. Y., for defendant I.V.O.W. Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDEN, Chief Judge.

The plaintiff MacMillan Company has brought this action against the I.V.O.W. Corporation to recover compensatory and punitive damages incurred as a consequence of the defendant's unauthorized use of certain plans, prepared by MacMillan, for the construction of an addition to a shopping center owned by I.V.O.W. MacMillan contends that the defendant's improper use of its plans infringed MacMillan's common law copyright in the plans, and unjustly enriched I.V.O.W. at the expense of the plaintiff. The court's jurisdiction is invoked under 28 U.S.C. § 1332 (1970).

At the close of the evidence the plaintiff moved to join William Szirbik, in his individual capacity, as a defendant in the action under Fed.R.Civ.P. 20(a). A corporate officer can be held liable for a tort in which he personally participated and the person wronged may proceed against him, although the corporation may also be liable. *New England Acceptance Corp. v. Nichols*, 110 Vt. 478, 488, 8 A.2d 665 (1939). William Szirbik was personally involved in the tortious conduct of the corporation and was a joint tortfeasor with the corporation. He was the only officer of the defendant who appeared as a witness at the trial. He was

present as the corporate representative of the defendant at the counsel table and actively participated throughout the entire proceeding. It appears that William Szirbik will not be prejudiced by his joinder, albeit at a late stage of the proceedings. His joinder may well obviate the necessity for further litigation of the same issues. *See* C. Wright and A. Miller, *Federal Practice and Procedure* § 1688. The plaintiff will be permitted to join William Szirbik as a defendant. *Cf. H. M. Kolbe Co. v. Shaff,* 240 F.Supp. 588 (S.D.N.Y.1965).

From the evidence presented to the court, sitting without a jury, the court finds the facts which follow. The defendant I.V.O.W. is a Vermont corporation with its principal place of business in Manchester, Vermont; it owns and operates a shopping center at that location.

During the early months of 1972 the principal local officers of I.V.O.W., William Szirbik, treasurer, and Virginia Szirbik, president, actively explored the project of constructing an addition to the existing shopping center. Mr. Szirbik has had extensive experience over many years as a building contractor. In recent years he has been engaged as a real estate developer in the area of Manchester, Vermont. After answering advertisements from several "pre–engineering" structural steel contractors in the spring of 1972, the defendant received responses from Etbro Construction Company of Rutland, Vermont, and the plaintiff, a New Hampshire corporation with its principal place of business in Keene, New Hampshire.[1]

William and Virginia Szirbik met initially with Robert Ettori of Etbro Construction in April of 1972 to discuss plans and a cost proposal for construction of the shopping center addition. The expansion contemplated at that time was limited to the con-

struction of a single store of approximately 10,000 square feet for lease to the Ben Franklin Store. At the meeting the Szirbiks presented Ettori with the written specifications and layout designs for the Ben Franklin Store and some rough hand–drawn sketches of their concept of the project. (Plaintiff's Exhibit 27.) Following that brief meeting, Robert Ettori and the Szirbiks did not meet again to pursue the project until November 25, 1972.

In May of 1972, in response to the solicitation of I.V.O.W., Allan McAnney, vice president of the MacMillan Company, first met with the Szirbiks at the offices of I.V.O.W. in Manchester, Vermont, to discuss the construction project. The prior consultation with Ettori was not disclosed. McAnney, an architectural draftsman by training, was a member of the "pre–engineering" division at MacMillan, which publicized and marketed a building system under which the structural steel manufacturer offers standard–sized, pre–cut–"pre–engineered"–building components. A pre–engineered structure was suggested by McAnney to the Szirbiks to meet the needs of I.V.O.W. at the lowest possible cost. At the meeting the Szirbiks expressed interest in pursuing the construction of a pre–engineered addition to the shopping center. In their discussions with McAnney they conveyed their general notions concerning how they envisioned an enlarged shopping center could be accomplished. McAnney was also given a plot plan of the shopping center, prepared by an architect, Fritz Dillman, in 1966, and a set of the specifications and layout designs for the Ben Franklin Store. As a result of this meeting McAnney was led to believe that I.V.O.W. wanted the plaintiff to propose plans for an addition to the shopping center and to submit a price for the proposed project to I.V.O.W.[2]

1. MacMillan Company is registered to do business in Vermont as a foreign corporation. None of its employees are architects, registered and certified by the State of Vermont as provided in 26 V.S.A. § 203 *et seq.*

2. The defendant contends that it never requested the plaintiff to prepare any plans for the proposed addition. Although it is possible that no explicit request was made at the initial meeting of the Szirbiks and McAnney, nonetheless McAnney's impression that a proposed plan was being sought was continually reinforced by William Szirbik's subsequent dealings with McAnney; and was confirmed in writing by Szirbik in his memo to McAnney, dated October 30, 1972 (Plaintiff's Exhibit 4).

Immediately after that meeting McAnney conducted an inspection of the building site and made some preliminary measurements of the building which was occupied by "Super Duper" Market, adjacent to the area of the proposed addition. After McAnney had worked up some sketches of a proposed addition for I.V.O.W., the "Super Duper" chain indicated its desire to expand its existing store, changing the criteria for the project. This required further consultations between McAnney and William Szirbik to accomplish solutions to a number of problems incident to the proposed project. The defendant required the structure to be located on a site that would avoid encroachment into the parking area within the property boundaries; a roof design that would minimize the tenant's heating costs, yet remain compatible in appearance with the existing stores in the shopping center; and a roof design to allow for snow and rain drainage to guard against accumulations. Preliminary drawings, presenting McAnney's resolution of these problems, were submitted to I.V.O.W. on August 11, 1972 (Plaintiff's Exhibit 2).

At a meeting early in September with the Szirbiks, Allan McAnney made an effort to reach a firm agreement on the final project plans and to confirm the business relationship between the parties. It was the general policy of MacMillan to prepare a preliminary layout and price for a prospective client without cost, but not to proceed beyond that point without compensation. McAnney prepared a commitment letter (Plaintiff's Exhibit 3) based on his layouts and a price estimate for the project as it was planned at that point in time. It was his purpose to have Szirbik approve this arrangement which would have committed I.V.O.W. to absorb any further costs in-

curred by MacMillan in preparing final drawings and specifications.[3] The dimensions of the addition, however, were again changed by I.V.O.W. at that meeting. Since the commitment letter was based on plans which did not include those changes, it was withheld and not submitted to Szirbik for signature. Its contents, nonetheless, were discussed with Mr. Szirbik and he offered no objection to the proposal.

Since the Szirbiks indicated to McAnney that MacMillan was the only builder being considered for the project and that I.V.O.W. was satisfied with MacMillan's proposal, McAnney understood that I.V.O.W. was seeking a negotiated price contract. Consequently, he did not press for a written commitment from I.V.O.W. to pay for the cost of final plans and specifications.

At this point in time the acts and representations of the defendant's treasurer induced McAnney to justifiably believe that MacMillan Company would be engaged to provide the materials and perform the construction work necessary to complete the addition to the shopping center. On the strength of this understanding, MacMillan undertook and completed the final plans and specifications.

Within several weeks McAnney prepared and submitted to I.V.O.W. further working drawings, including the most recent changes in the project. Some delay in preparing the final drawings was interposed when it was discovered that the plot plan, provided by Szirbik to McAnney, was inaccurate. Another survey was done by Stewart Dauchy to establish accurately the rear lot line. While awaiting MacMillan's final proposal, William Szirbik submitted copies of the preliminary plans to prospective tenants and to a bank for their approval.[4] By letter dated October 30, 1972, William Szir-

---

3. It is the custom of the construction industry to include the costs of preliminary design work for a contract as an element in the final construction price. Expert testimony fixed these preliminary design costs at from 8 to 9½% of the total contract price. Had MacMillan been successful in obtaining the I.V.O.W. contract, design costs would have been recouped in this customary fashion. The purpose of the commitment letter was to insure MacMillan some

compensation in the event that it was not awarded the contract.

4. One copy was also given to the surveyor, Dauchy, so that he could prepare a plot plan of the shopping center with the proposed addition sketched in. Dauchy testified that he would have been unable to prepare such a plan without MacMillan's plans.

bik requested additional copies of the plans for the tenants and the bank. McAnney complied. In this letter Szirbik also urged:

> I hope you are progressing with the plans and proposal with which you can undertake the initial construction phase. Just as soon as you can, get the proposal to us so we can act and get approval.

(Plaintiff's Exhibit 4.)

At some time early in November, McAnney completed his final working drawings of the proposed addition and submitted them to I.V.O.W. (Plaintiff's Exhibit 7). The drawings, characterized by two of the architects testifying in the case as working drawings, embodied MacMillan's unique and innovative solution to the several problems posed by the project. The final plans proposed a pre–engineered, flat–roofed steel structure with a false roof (giving the illusion of a peaked roof so as to appear compatible with the existing buildings in the center). The proposal consisted of six separate drawings: (1) a plot plan and roof plan; (2) the foundation plan; (3) the floor plan; (4) cross–sections of the roof facade; (5) exterior elevations and (6) cross–sections of the walls of the building.[5] These plans were sufficiently detailed as to permit MacMillan to construct the pre–engineered structure directly from the plans.[6]

It appears that the Szirbiks provided Allen McAnney with many suggestions and some rough sketches to express their wishes in the design of the proposed addition. MacMillan's final proposal was primarily the original intellectual product of Allen McAnney.[7]

On November 15, 1972, Allan McAnney hand delivered a letter to William and Virginia Szirbik at their office in Manchester, Vermont, which proposed a cost of $169,757 for construction of the addition. The Szirbiks expressed satisfaction with the proposal as set forth in the drawings, but suggested to McAnney that the price could be reduced by some eliminations. On returning to his home office, McAnney was able to reduce the price to $166,032 by cutting back the overhang of the roof and specifying that I.V.O.W., instead of MacMillan, provide certain gravel fill. This adjustment was related to William Szirbik by telephone on November 20, 1972. Szirbik expressed his approval to McAnney and asked McAnney to prepare a final contract based on the $166,032 figure.

McAnney, accompanied by a friend, Susan Brown (now Hessleton), delivered the proposed negotiated price contract, two sets of final working drawings and 13 pages of specifications to William and Virginia Szirbik at their I.V.O.W. offices on Friday, November 24, 1972. After reviewing the plans in some detail, Virginia Szirbik inquired as to whether further reductions could be made, suggesting that the Szirbiks might be allowed a percentage of any savings effected by MacMillan during construction. McAnney indicated that the present proposal was MacMillan's best price and the Szirbiks assented. Virginia Szirbik undertook to telephone one of their partners who was a principal stockholder in I.V.O.W., a Mr. Slutzky in New York, to obtain his approval before entering into the contract. Since he could not be reached, the Szirbiks retained

---

**5.** Gene Mellish, a registered engineer in the State of New Hampshire, assisted McAnney in resolving certain of the technical questions that the project raised.

**6.** Clarence Whitney, the architect at Crandell Associates who was responsible for the plans actually used in the construction of the addition, indicated that for his purposes the MacMillan plans were not sufficiently detailed to use in constructing the building that he had designed. He admitted, however, that they might be adequate for a structural steel contractor, such as MacMillan, to use in constructing a pre–engineered building.

**7.** Implicit in this finding is the fact that the court places little credence in the testimony of William Szirbik that the MacMillan plans were simply enlargements of his sketches and concepts which he had earlier provided to the plaintiff. The sketches and elevation views, claimed by William Szirbik to be reproductions of materials provided to the plaintiff during the autumn of 1972, appear to the court to have been traced either from the plaintiff's drawings, or from the final Crandell drawings (which themselves appear to have been partially traced from the plaintiff's drawings).

the documents. In so doing, the Szirbiks assured McAnney that they would review the proposal with Mr. Slutzky over the weekend and then notify McAnney to enable MacMillan to proceed expeditiously with construction. Neither of these assurances was fulfilled by the Szirbiks.

Allan McAnney and Susan Brown departed from the meeting with substantial assurance of a final contract. Immediately after their meeting William Szirbik was in communication, by telephone, with Robert Ettori of Etbro Construction Company. He was informed there was progress in the project and was invited to come to the Szirbik home the next day to discuss some plans I.V.O.W. had formulated since their previous meeting seven months earlier.

Ettori met with the Szirbiks the following day, November 25, 1972, at the Szirbik's residence in Dorset, Vermont. He was asked to put together a price for construction of the addition based on a set of plans given to Ettori by William Szirbik. These plans were the working drawings for MacMillan's proposal, given to Szirbik earlier in the month by Allan McAnney. The title blocks of the drawings, which indicated they were prepared by MacMillan, had been excised by Szirbik. The 13 pages of specifications, submitted by MacMillan the day before, were also shown to Ettori.

With the guidance of the MacMillan plans, Ettori was able to compute a price proposal for I.V.O.W. in about two weeks. Ettori testified that in pricing the project, based on the plans provided to him, he was confronted with no design problems. Had the plans not been available to him, Ettori would not have been able to arrive at an accurate construction price in such a short period of time. The initial price submission by Ettori was $165,000. After some negotiating and cost–cutting, I.V.O.W. agreed with Ettori on a figure of $155,000.

On December 15, 1972, the defendant used a copy of MacMillan's working draw-

ings to support I.V.O.W.'s application for an Act 250 permit before a hearing of the State of Vermont District Environmental Commission. MacMillan was not consulted nor advised that I.V.O.W. used MacMillan's plans to support its Act 250 application. I.V.O.W. did not reveal that it submitted MacMillan's plans and specifications for the use of Etbro Construction Company.

Meanwhile MacMillan awaited a response from I.V.O.W. on its final proposal. Allan McAnney tried on numerous occasions to communicate with Szirbik at I.V.O.W.'s office in Manchester to no avail. Finally, on December 20, 1972, McAnney wrote William Szirbik, inquiring of I.V.O.W.'s intentions with respect to the MacMillan contract proposal. The letter also requested, in the event I.V.O.W. had decided to discontinue its dealings with MacMillan, that Szirbik return MacMillan's proposal documents, including both copies of the plans, specifications and the contract (Plaintiff's Exhibit 10).

At a meeting of building contractors, during the first week of January in 1973, Allan McAnney happened to meet Robert Ettori. During the course of their conversation, McAnney discovered from Ettori that Etbro Construction Company was going to build the addition to the Manchester shopping center for I.V.O.W. He further learned that Ettori had been furnished drawings by William Szirbik for the purpose of preparing a bid on the project. Shortly thereafter McAnney visited the Etbro Construction Company office in Rutland. His suspicion that the plans provided to Ettori were the MacMillan working drawings was confirmed.

Late in January MacMillan's attorney, reiterating the request made by McAnney a month earlier, demanded return of the drawings, specifications and contract. Finally, on the fifth of February, Szirbik's attorney returned the plans requested (Defendant's Exhibit N).[8]

---

**8.** MacMillan's request of I.V.O.W. for return of its plans, specifications and contract explicitly referred only to those documents delivered by McAnney on November 24, 1972, as part of

MacMillan's final proposal. On returning those documents, Szirbik still retained a number of MacMillan's earlier working drawings which

Early in 1973 Robert Ettori, at his own expense, retained Crandell Associates, an architectural firm in Rutland, Vermont, to develop final plans for the project. Ettori gave Clarence Whitney, an associate in the firm, a set of the MacMillan drawings to assist him in the preparation of his plans. By use of the drawings and concepts expressed in MacMillan's plans (Plaintiff's Exhibit 11), Crandell prepared further plans for the construction of the addition (Plaintiff's Exhibit 12). Crandell's final version of the addition modifies the MacMillan plans in many respects, since the Crandell plans were not a pre-engineered structure. However, it was admitted by Crandell's architect that the MacMillan plans were useful in Crandell's preparation of its drawings.[9] Crandell billed Etbro Construction Company approximately $3,000 for its plans.

Etbro Construction Company completed construction of the addition to the shopping center in September, 1973. Two months later this action was brought to recover for the improper use and appropriation by the defendant of the plans prepared by the plaintiff.

The court finds that the reasonable value of the plaintiff's services in designing, preparing the plans and specifications requested by the defendant is $12,500. This amount is supported by the expert opinion evidence presented at the trial and is consistent with the understanding which the defendant's managing officer, Szirbik, led the plaintiff to believe would be acceptable. This amount also equates with the cost advantage which the defendant derived from use and leverage afforded by the defendant's appropriation of the plaintiff's work product.

## CONCLUSIONS

I.V.O.W. resists recovery by MacMillan on any theory on the contention that the activities of the plaintiff in preparing the plans, specifications and drawings for I.V. O.W. constituted a violation of the Vermont statute governing the licensing of architects, 26 V.S.A. § 121 *et seq.*

The Vermont statutory law, upon which the defendant relies, provides:

The term "architect" or "registered architect" as used herein shall mean a person who holds himself out as able to perform, or does perform, while representing himself as an architect, any professional service such as consultation, investigation, evaluation, planning designing (including esthetic and structural design), or responsible supervision of construction in connection with any buildings, structures, or projects, or the equipment or utilities thereof wherein the safeguarding of life, health, or property is concerned or involved.

26 V.S.A. § 121.

This chapter shall not be construed to affect or prevent the practice of engineering by a professional engineer duly licensed under the laws of this state; nor to apply to any person licensed as a professional engineer in this state except that such persons shall not use the designation architect, architectural, or architecture unless licensed under the provisions of this chapter; nor to prevent the preparation of working drawings, details and shop drawings by persons other than architects for use in connection with the execution of their work; nor to prevent employees of those lawfully practicing as architects under the provisions of this chapter from acting under the instruction, control, or supervision of their employers; nor to apply to the supervision by builders or superintendents employed by such builders, of the construction or structural alteration of buildings or structures; all provided, however, that nothing herein contained shall be construed to permit any person not licensed as provid-

were substantially the same as the plans returned.

**9.** The fact that drawing number two of Crandell's plans (Plaintiff's Exhibit 34) overlays precisely drawing number four of the MacMillan plans leads the court to the conclusion that that particular Crandell drawing was drafted directly from the MacMillan plans.

ed in this chapter to use the title architect, or any title, sign, card, or device to indicate that such person is an architect.

26 V.S.A. § 124.

No person shall use the title architect, or any sign, card, or device to indicate that such a person is an architect, unless such a person shall have secured a certificate of registration from the board in the manner herein provided.

26 V.S.A. § 207.

The plaintiff engaged no architect, registered in Vermont, during the time in 1972 when it prepared the plans for the Manchester shopping center addition. Defendant contends that the plaintiff's plans and specifications were architectural in nature, thus within the proscription of the licensing statute. Since they were not prepared by a properly licensed architect, defendant argues an action to recover for those services is foreclosed.

The legislation recognizes that in the construction industry there are occasions when the work of an architect and the work of an engineer or builder may overlap. This possibility is recognized in the provisions of Title 26 of the Vermont code dealing with the licensing requirement of these professions. 26 V.S.A. § 1124 exempts certain services of an architectural nature performed by engineers or builders from the licensing requirements of architects; 26 V.S.A. § 1054(8) reciprocates, exempting architects from the licensing requirements of engineers in certain circumstances.

Although the scope of this exemption has not been delineated by the Supreme Court of Vermont, a number of jurisdictions with licensing laws, similar to the Vermont scheme, have given a liberal reading to similar exemption provisions. *See Jones v. Spindel,* 128 Ga.App. 88, 196 S.E.2d 22, 29 (1973) (and cases cited).

The defendant's reliance on *Rodgers v. Kelley,* 128 Vt. 146, 259 A.2d 784 (1970) and *Markus & Nocka v. Goodrich,* 127 Vt. 404, 250 A.2d 739 (1969) that the statutory law of Vermont precludes recovery by the plaintiff, on any theory, is misplaced.

*Markus & Nocka* was a Massachusetts architectural firm retained by a resident architect as consultants in planning and designing proposed hospital construction in Vermont. No members of the plaintiff's firm were authorized to perform architectural services in Vermont under the provisions of 26 V.S.A. §§ 122, 123 and 207. The action was brought on an architectural contract performed in Vermont. The Vermont Supreme Court held that the contract was in violation of the statute and unenforceable in the Vermont courts. The present action is not founded on a contract to perform architectural services, nor is the plaintiff's claim founded on a contractual undertaking.

The plaintiff in *Rodgers v. Kelley* advanced various claims, including an action in contract to recover for architectural services furnished by the plaintiff on an oral contract with the defendants. Again the plaintiff was not registered as an architect under the Vermont statute. The court held the contract was unenforceable, citing *Markus v. Goodrich, supra.* The opinion of the court states:

> The evidence is clear that, in the community of Stowe, the plaintiff was known as a proficient practitioner of all of the architectural arts with respect to home building, at least. It was a business operation for which he received fees. He presented himself to the public as one who does the work of an architect. This constitutes holding oneself out as an architect, and is part of the very activity sought to be regulated through registration. It is forbidden to the unlicensed who do not fall within the permitted exceptions listed in the law, as this plaintiff does not. 26 V.S.A. § 124.

128 Vt. at 148, 259 A.2d at 785.

The facts in the present action have a different bearing. No evidence was presented at the trial to indicate that MacMillan held itself out to I.V.O.W., or the public generally, as performing architectural services. MacMillan's preparation of the plans, drawings and specifications for I.V. O.W. was work preparatory and incidental

to the project which the plaintiff was led to believe it would be engaged to construct. There was no intention in either party for the plaintiff to submit the proposal as a professional architect.

■ The various plans were characterized by Clarence Whitney and plaintiff's expert, J. William Hasskarl, as "working drawings." As such, the services rendered by the plaintiff were lawfully performed within the permitted exceptions referred to by the court in *Rodgers* as "working drawings, detail and shop drawings by persons other than architects for use in connection with the execution of their work." 26 V.S.A. § 124. The plaintiff's right to recover is principally founded on the claim of a common law copyright in the plans it prepared for the Manchester shopping center. It contends that any publication of the plans was a "limited publication" which did not affect its copyright. From this position MacMillan urges that the defendant's improper use of the plaintiff's plans was an infringement of its copyright and constituted a conversion of the plans, resulting in the unjust enrichment of I.V.O.W. at the expense of MacMillan.

These issues must be determined according to the law of Vermont. Since we find little Vermont authority on point, the law of other jurisdictions must be consulted in the attempt to forecast how the Vermont Supreme Court would apply the common law in dealing with the claim.[10]

■ Architectural plans containing some substantial originality of their author are protected by the common law copyright. *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 389–90 (8th Cir. 1973); *Ketcham v. New York World's Fair 1939, Inc.*, 34 F.Supp. 657 (S.D.N.Y.1940)

aff'd 119 F.2d 422 (2d Cir. 1941) (Mem.); *Smith v. Paul*, 174 Cal.App.2d 744, 345 P.2d 546, 77 A.L.R.2d 1036, 1041 (1959); Nimmer, *The Law of Copyright* § 26 (1967); 5 Am.Jur.2d Architects § 10; Annot., 77 A.L.R.2d 1048 (1961). The MacMillan plans consisted of six sheets of working drawings and thirteen pages of specifications which the plaintiff had produced in sufficient detail to accomplish the proposed construction of the addition to the shopping center. The plans embodied some original and creative solutions to the various design problems involved in the project. They were essentially the product of the independent efforts of the plaintiff's draftsman, McAnney. The court concludes that the plaintiff's plans for the I.V.O.W. project were sufficiently original to achieve common law copyright protection.[11] As owner of those common law rights, MacMillan is entitled to the same protection of those rights as is accorded to other property rights until the common law copyright is lost through a general publication of the plans. *See Schwartz v. Broadcast Music, Inc.*, 180 F.Supp. 322, 328 (S.D.N.Y.1959).

■ The owner of a common law copyright has the right to be the first person to publish his work; upon publication the common law copyright is terminated. *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 8 L.Ed. 1055 (1833); *National Comics Publications v. Fawcett Publications*, 191 F.2d 594, 598 (2d Cir. 1951). To constitute a publication there must be a dissemination of the work to the public in such a way as to engender the belief that it was intended to make it common property. A limited publication of a work does not divest the holder of the common law copyright. *American Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299–300,

---

10. 17 U.S.C. § 2 specifically permits the retention of common law copyright by the owner of an unpublished work. This statute permits the states to retain jurisdiction to hear cases dealing with infringements of common law copyrights and to regulate such infringements through their own laws. *Press Publishing Co. v. Monroe*, 73 F. 196 (1st Cir. 1896); *International Tape Manufacturer's Ass'n v. Gerstein*, 344 F.Supp. 38, 56 (S.D.Fla.1972). *See Smith*

*v. Little, Brown & Co.*, 360 F.2d 928, 930 (2d Cir. 1966); *Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir. 1973).

11. In reaching this conclusion we reject the argument advanced by I.V.O.W. that the plans were actually authored by William Szirbik and merely enlarged and refined by Allan McAnney at his drawing board, as being unsupported by the credible evidence.

28 S.Ct. 72, 77, 52 L.Ed. 208 (1907). To avoid a destruction of a common law copyright, the publication "must be restricted both as to persons and as to purpose, or it cannot be called a private or limited publication." *American Visuals Corp. v. Holland*, 239 F.2d 740, 744 (2d Cir. 1956) (quoting *White v. Kimmell*, 193 F.2d 744, 747 (9th Cir. 1952).

Applying these general principles of copyright law to the facts of the present case, the court is persuaded that any distribution of the plans for the shopping center addition made by the plaintiff was to a restricted group and for the limited purpose of advancing the construction project. The plans were developed by the plaintiff for the purpose of obtaining the contract to construct the addition. Before construction of the project could begin it was necessary for the defendant I.V.O.W. to disclose the proposed plans to prospective tenants of the shopping center addition in order to gain their approval. Similarly before the defendant's bank would agree to finance the construction, it was necessary to review the plans. The only distribution of its plans allowed by MacMillan to anyone, other that I.V.O.W., was to this restricted group for the limited purpose of enabling the defendant to obtain needed approvals of the proposed structure.

 The defendant has argued that there can be no limited publication in these circumstances since the plaintiff's delivery of the plans to I.V.O.W. was not accompanied by an express limitation as to their use. The prevailing law in this regard is that:

"A limited publication is 'one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public.' . . . . Further, to be general a publication must be such ' " ' . . . as to justify the belief that it took place with the intention of rendering . . .

[the] work common property.' " ' . . While the test is properly one of intention, it is clear that the unexpressed, subjective intention of the creator cannot be allowed to govern . . .; rather the implications of his outward actions to the reasonable outsider are controlling."

*Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d at 390 n.7 (quoting *Edgar H. Wood Associates, Inc. v. Skene*, 347 Mass. 351, 197 N.E.2d 886, 892 (1964)). The circumstances of MacMillan's delivery of its plans to I.V.O.W. do not justify the conclusion that the delivery was made with the intention of rendering the plans common property. Although MacMillan did not expressly limit I.V.O.W.'s use of the plans, the plans were delivered under conditions impliedly precluding their dedication to the public.[12] No loss of MacMillan's common law copyright in its plans for the addition to the shopping center was incurred by its delivery of several copies of the plans to the defendant for distribution to the financing institution and prospective tenants.

I.V.O.W. was given the plans for the addition to the shopping center on the tacit understanding that they were to be used if MacMillan were awarded the construction contract. After MacMillan was rejected as the builder, William Szirbik excised the title blocks, indicating MacMillan's authorship, from the plans and gave them to Etbro Construction Company for its use in designing the project. In turn, Etbro Construction Company made the plans available to Crandell Associates, the architectural firm that prepared the final plans for the building from the MacMillan plans.

 When the plans prepared by the plaintiff (Plaintiff's Exhibit 7, 11) are compared with those prepared by Crandell Associates (Plaintiff's Exhibit 12), it is apparent that drawing A–2 of the Crandell plan is a virtual reproduction of drawing number

---

12. A distribution of plans to potential contractors and subcontractors for bidding purposes does not constitute a general publication. *See Read v. Turner*, 239 Cal.App.2d 504, 48 Cal. Rptr. 919, 40 A.L.R.3d 237, 244–45 (1966). This is true even though the plans are not marked confidential, are not required to be returned, and can be obtained without paying a deposit. *See Nucor Corp. v. Tennessee Forging Steel Service, supra* at 390; *Pressed Steel Car Co. v. Standard Steel Car Co.*, 210 Pa. 464, 60 A. 4 (1904).

4 in the MacMillan plans. *See* note 9, *supra.* The similarities in the arrangement and substance of the two drawings compel the conclusion that Crandell drawing A–2 was a copy. Moreover, the remaining Crandell drawings exhibit other similarities to the MacMillan plans in design and detail. To establish a copyright infringement[13] it is not necessary that the whole or even a large part of the MacMillan plans were copied. It is sufficient if a material and substantial part were copied even though it constitutes only a small part of the entire package of drawings. *Nucor Corp. v. Tennessee Forging Steel Service, Inc.,* 476 F.2d 386, 391 (8th Cir. 1973); *Nikanov v. Simon & Schuster, Inc.,* 246 F.2d 501, 504 (2d Cir. 1957).

■■■■■ Although the principals of I.V. O.W. did not personally copy the MacMillan drawings, the defendant is nonetheless liable for any infringement which may have occurred. Since common law copyright infringement is wrongful, concepts of tort liability are relevant in fixing the scope of the remedy. The basic common law doctrine that one who knowingly participates in, or furthers a tortious act, is jointly and severally liable with the prime tortfeasor, is applicable to the present case. *See Screen Gems–Columbia Music, Inc. v. Mark Fi Records, Inc.,* 256 F.Supp. 399, 403 (S.D.N.Y. 1966); W. Prosser, *Law of Torts,* § 46 at 291–92 (4th ed. 1971). Consequently, anyone "who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."[14] *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971). *See Kalem Co. v. Harper Brothers,* 222 U.S. 55, 63, 32 S.Ct. 20, 22, 56 L.Ed. 92 (1911); 18 Am.

Jur.2d "Copyright and Literary Property" § 124 at 411.

■■■■ I.V.O.W. could have had the addition to its shopping center designed and constructed without the use of the plaintiff's plans. Nonetheless, the defendant did allow Etbro Construction Company and Crandell Associates to use MacMillan's plans in preparing the final plans used in construction. The appropriation of the fruits of MacMillan's labor by the defendant, in order to facilitate the preparation of comparable plans without the expenditure of the time and effort required for independently arrived at results, is copyright infringement. *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 120 (2d Cir. 1962).

■■■■ The facts that establish that I.V. O.W. infringed MacMillan's common law copyright also support liability on a conversion theory. The essence of an action of conversion in Vermont is that "[c]onversion consists in . . . appropriating property to one's own use and beneficial enjoyment, . . . exercising dominion over it to the exclusion of owner's rights . . . ." *Redd Distributing Co. v. Bruckner,* 128 Vt. 635, 639, 270 A.2d 580, 583 (1970). *See Restatement (Second) of Torts,* § 228 (1965); 1 F. Harper & F. James, *The Law of Torts,* § 2.24 (1956).

■■■■ Under the circumstances of the delivery of the plans by Allan McAnney to I.V.O.W., the defendant was implicitly authorized to use MacMillan's plans only in connection with MacMillan's bid for the construction contract. After MacMillan was rejected as the builder, the defendant's appropriation of the plans to its own use exceeded that authorization. Accordingly, I.V.O.W. is subject to liability for conver-

---

**13.** We are of the view that were the Supreme Court of Vermont to articulate the necessary elements to establish an infringement of an unpublished material, protected by a common law copyright, it would conclude that they are essentially the same as would be required to show infringement of published material, protected by statutory copyright. *See Smith v. Little, Brown & Co.,* 245 F.Supp. 451, 457 (S.D. N.Y.1965) aff'd 360 F.2d 928 (2d Cir. 1966).

**14.** While I.V.O.W. can be held liable in tort under this reasoning, the infringing conduct of Crandell or Etbro Construction Co. would not incur liability on their part if they were ignorant of their unauthorized use of the MacMillan plans. See 1 F. Harper & F. James, *The Law of Torts* § 2.24 at 163 (1956).

sion to the plaintiff, whose right to the exclusive use of the plans was violated.[15]

■ The plans were prepared at considerable expense to the plaintiff. By the misappropriation, MacMillan has sustained damage. Under the particular circumstances of this case, the most equitable measure of the plaintiff's damage is the reasonable value to I.V.O.W. of its use of the MacMillan plans. *See Read v. Turner,* 239 Cal. App.2d 504, 48 Cal.Rptr. 919, 40 A.L.R.3d 237, 245 (1966); 18 Am.Jur.2d "Copyright and Literary Property" § 136 at 423–24.

The testimony of Allan McAnney established that he spent a substantial portion of time during a six months period in preparing the final plans for I.V.O.W. Those plans, in their final form, would have been adequate to use in constructing the building. With the assistance of the MacMillan plans, I.V.O.W. was able to obtain a firm bid for the project from Etbro Construction Company within two weeks; a considerably longer period would have been necessary without the plans. Using the MacMillan plans, I.V.O.W. was able to obtain an Act 250 permit in December of 1972 more expeditiously than it could have without the plans. With the aid of the MacMillan plans, Crandell Associates was able to design a similar structure with a minimum of independent effort and, presumably, at a minimal cost. Finally, the overall time savings made possible through the defendant's use of the plans enabled I.V.O.W. to have the project completed and generating income at an earlier point in time than would have been possible without the use of plaintiff's plans.

Expert testimony established that it is the custom in the construction trade to include the costs of design work for a particular construction project in the final contract price. These design costs compose approxi-

mately 8% of the total contract cost. This the defendant well knew. The design work completed by Allan McAnney for MacMillan had a reasonable value of $12,500.[16] Had the work been performed by an architectural firm, the cost to the defendant would have been substantially higher. The court considers that amount to represent a reasonable approximation of the overall value obtained by the defendant from its improper use of the MacMillan plans. In addition, interest will be assessed against the defendant from the date of the initial misappropriation of the plans, November 25, 1972, until April 2, 1974, at a rate of 7½% and from April 3, 1974, to the date of a final order in this case at a rate of 8½%.

■ Beyond its actual damage, the plaintiff asserted a claim for a punitive recovery. Exemplary damages are sometimes allowed in case of copyright infringement. *See Press Publishing Co. v. Monroe,* 73 F. 196 (2d Cir.), *dismissed on other grounds,* 164 U.S. 105, 17 S.Ct. 40, 41 L.Ed. 367 (1896). However, exemplary damages are not recoverable as a matter of right. The allowance of such an award is in the discretion of the trier of the fact where punishment is appropriate because of the malicious and wanton nature of the acts of which the defendant has been found guilty. *See Parker v. Hoefer,* 118 Vt. 1, 20, 100 A.2d 434 (1953). While the defendant's use of the plaintiff's work was deceptive, it was not done in malice, but rather as a wrongful means to gain a favorable contract price. The damages assessed against the defendant are substantial and will adequately compensate the plaintiff without imposing a punitive award as an example to others. *See Read v. Turner,* 239 Cal.App.2d 504, 48 Cal.Rptr. 919, 40 A.L.R.3d at 246.

Accordingly, it is ORDERED:

---

15. *Compare Vermont Acceptance Corp. v. Wiltshire,* 103 Vt. 219, 153 A. 199 (1931). In the *Wiltshire* case the defendant purchased an automobile, signing a conditional sales agreement with the plaintiff which provided that the car was not to be used in any unlawful pursuit. Subsequently the defendant was apprehended for illegally transporting liquor in the car. This

unauthorized use of the car was found by the court to constitute a conversion.

16. The practice of the MacMillan Company was to include in their construction fee a figure for preparation costs which would not exceed 8% of the contract amount. Plaintiff's Exhibit # 3.

The plaintiff's motion to join William Szirbik as a defendant is granted. Entry of final judgment will be withheld to enable the plaintiff to accomplish service of the summons and a copy of the complaint as amended on the defendants. Defendant Szirbik will be afforded the opportunity to respond to the complaint within twenty days after service of the amended complaint.