**CITY OF BLOOMINGTON, INDIANA, et al., Plaintiffs–Appellants,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, etc., et al., Defendants–Appellees.**

No. 88–2660.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1989.

Decided Dec. 6, 1989.

Rehearing and Rehearing En Banc Denied Jan. 23, 1990.

---

Joseph V. Karaganis (argued), A. Bruce White, Karaganis & White, Chicago, Ill.,

Geoffrey M. Grodner, Mallor, Grodner & Bohrer, James R. Trulock, II, Bloomington, Ind., for plaintiffs-appellants.

Joseph B. Carney, Baker & Daniels, Indianapolis, Ind., David R. Berz, Stanley M. Spracker, Weil, Gotshal & Manges, Washington, D.C., Bryan G. Tabler, Michael R. Fruehwald (argued), Stanley C. Fickle, Michael Rosiello, Barnes & Thornburg, Indianapolis, Ind., Anna Swerdel, Deborah J. Schmall, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

In April 1981 the City of Bloomington, Indiana, and its Utilities Service Board (collectively "City") sued Westinghouse Electric Corporation for $149,000,000 damages and equitable relief alleging Westinghouse discharged waste containing polychlorinated biphenyls (PCBs) into Bloomington's sewers and into its Winston–Thomas Sewage Treatment Plant. In October 1981 the City filed an amended complaint adding Monsanto Company as a defendant and also covering the presence of PCB waste at the City's Lemon Lane Landfill. The amended complaint sought $80,000,000 in damages and equitable relief from Monsanto. Proceedings were stayed in October 1983 to permit Westinghouse and the City to negotiate a settlement. The negotiations resulted in an agreement—referred to by the parties and the lower court as a consent decree—approved by Judge Dillin in August 1985.

In March 1986 the City filed its second amended complaint solely against Monsanto, reasserting liability under theories of public and private nuisance, trespass, abnormally dangerous activity, and negligence, and adding a wilful and wanton misconduct count as well as three counts under the Racketeering Influenced Corrupt Organizations Act (RICO). The *ad damnum* was $387,000,000.

On June 27, 1988, the district court handed down an opinion dismissing the counts of the second amended complaint based on nuisance, trespass, abnormally dangerous activity, and RICO. Two days thereafter the district court denied leave to file a third amended complaint [1] and a week thereafter the case went to trial on the negligence and wilful and wanton misconduct counts contained in the second amended complaint. The jury found in favor of Monsanto and on July 18, 1988, judgment was entered in its favor.

The City has appealed basically on the ground that the trial evidence presented jury issues under the theories of nuisance, abnormally dangerous activity, and trespass, and that the trial court therefore erred in granting the defendant's Rule 12(b)(6) motion to dismiss these claims. If the City is right, it is entitled to a new trial. We conclude, however, that the City had no viable claim against Monsanto based on those theories and therefore affirm.

## I. Factual Statement

PCBs are chemical mixtures manufactured by Monsanto and others and sold for various industrial purposes, including insulation of high voltage electrical equipment such as capacitors and transformers.

Industrial experience showed that excessive long-term exposure to PCBs could cause skin rashes and liver disturbances. Consequently Monsanto confined its sales of PCBs to sealed containers for electrical uses, accepted used PCB fluid for reclamation and incineration, and informed customers of the latest information on the effects of PCBs. In 1970 Monsanto commenced using a warning label advising customers not to permit PCBs to enter the environ-

ment and in 1976 Monsanto announced that it would stop selling PCBs since substitutes were available for electrical equipment manufacturers.

One of Monsanto's customers for PCBs was Westinghouse. Westinghouse used PCBs in its Bloomington plant where it manufactured capacitors. Westinghouse waste containing PCBs was hauled to various Bloomington area landfills, and small concentrations of PCBs also got into the sewer effluent of the Westinghouse plant.

In 1970, the sales agreement between Monsanto and the Westinghouse Bloomington plant contained a provision requiring Westinghouse to use its best efforts to prevent PCBs from entering the environment and Monsanto instructed Westinghouse how to dispose of PCBs so that they would not enter water systems, including the City's sewage systems. Monsanto also made recommendations to reduce PCB discharges by treating waters before their release to sewers. Westinghouse took a number of steps to reduce PCB discharges from its Bloomington plant until Monsanto stopped selling any PCB products to that plant in September 1977.

Water containing PCBs from the Westinghouse plant was found in the City's Lemon Lane Landfill and its Winston–Thomas Sewage Treatment Plant and connected sewers. The 1985 consent decree between the City and Westinghouse provides for an environmental cleanup with an estimated cost to Westinghouse in excess of $100,000,000. City Br. at 5.[2] The decree provides for the excavation, removal, and incineration of PCB-contaminated material from the Lemon Lane Landfill, the Winston–Thomas Sewage Treatment Plant, and various other sites.[3] In spite of this

---

1. The third amended complaint was similar to its predecessor but was fleshed out with documentary references and requested $750,000,000 in damages. Each of the complaints against Monsanto strikingly increased the amount of damages sought from that defendant.

2. Judge Dillin's description of the consent decree gives an estimated cost to Westinghouse of from $13,000,000 to $65,000,000 for the cleanup. Entry of August 22, 1985, at 14.

3. More specifically, the district court's entry approving the consent decree describes Westinghouse's undertakings as follows:
   a. To excavate and remove materials from the six sites;
   b. To remove sediment from certain streams and stream banks;
   c. To construct a federal, state and city approved high temperature incinerator to incinerate PCBs, associated hazardous wastes and soil solid waste in accordance with the requirements of federal, state and local law;

comprehensive program, the City, in its last proposed pleading against Monsanto, seeks an additional $750,000,000.

The City is not urging us to upset the judgment against it on its negligence and wilful and wanton misconduct theories that were tried to the jury. Rather it contends that the district court erred in dismissing the claims based on nuisance, trespass, and abnormally dangerous activity and that the City is therefore entitled to a new trial. We review a Rule 12(b)(6) dismissal under a *de novo* standard. *Corcoran v. Chicago Park District*, 875 F.2d 609, 609 (7th Cir. 1989).

## II. Analysis

### A. Nuisance

■ The City endeavors to recover on the basis of public or private nuisance by stating that Monsanto only opposes nuisance liability on the ground that Monsanto's own plant was not the source of the pollution. This is a misreading of Monsanto's position. As the district judge recognized, the essence of the tort of nuisance is one party—here Westinghouse—"using his property to the detriment of the use and enjoyment of others." Entry of June 27, 1988, at 4, citing *Friendship Farms Camps, Inc. v. Parson*, 172 Ind.App. 73, 359 N.E.2d 280, 282 (1977). The City has not refuted this requirement in either of its briefs, nor has it been able to find any cases holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale.[4] Since the pleadings do not set forth facts from which it could be con-

cluded that Monsanto retained the right to control the PCBs beyond the point of sale to Westinghouse, we agree with the district court that Monsanto cannot be held liable on a nuisance theory.

The City relies on the Restatement of Torts (Second) § 821D, which reads as follows: "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." Here, however, there is no basis upon which to conclude that Monsanto—as opposed to Westinghouse—has invaded the City's interest in the enjoyment of land. Section 821B defines a public nuisance as "an unreasonable interference with a right common to the general public." Since there is no basis upon which to conclude that Monsanto itself interfered with such a right, that definition has not been satisfied either.

The uncontested record shows that when alerted to the risks associated with PCBs, Monsanto made every effort to have Westinghouse dispose of the chemicals safely. Westinghouse was in control of the product purchased and was solely responsible for the nuisance it created by not safely disposing of the product. *County of Johnson v. United States Gypsum Co.*, 580 F.Supp. 284, 294 (E.D.Tenn.1984), modified on other grounds, 664 F.Supp. 1127 (E.D.Tenn.1985). The allegations do not support the proposition that Monsanto participated in carrying on the nuisance. Without such participation, Monsanto cannot be liable within the definition of the Restatement of Torts (Second) § 834.[5] The dismissal of nuisance Counts XI and XII was warranted.

---

d. To transport to the incinerator and incinerate the materials removed from the six sites;
e. To dispose of the ash and other by-products of the incineration process, in accordance with the requirements of law;
f. To perform certain interim remedial measures at the sites, including monitoring; and
g. To properly close, maintain and monitor each site after the PCBs and other materials have been removed.
Entry of August 22, 1985, at 15.

**4.** For cases holding manufacturers not liable for nuisance claims arising from the use of their product subsequent to sale, Judge Dillin justifiably relied on two cases applying New Hampshire law, *City of Manchester v. National Gyp-*

*sum Co.*, 637 F.Supp. 646, 656 (D.R.I.1986) (asbestos), and *Town of Hooksett School District v. W.R. Grace & Co.*, 617 F.Supp. 126, 133 (D.N.H. 1984) (asbestos).
 Monsanto does not rely on the Indiana statutory "coming to the nuisance" exception to the definition of a nuisance, so that there is no need here to determine its applicability. See *Erbrich Products Co., Inc. v. Wills*, 509 N.E.2d 850, 857–859 (Ind.App.1987).

**5.** That section provides:
 One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on.

## B. Trespass

█ Count XIII alleges that Monsanto's conduct causing the PCB contamination of the City's property constituted "trespass under Indiana law." The district court dismissed Count XIII because the City did not allege that "Monsanto performed any intentional act, which act could have resulted in the trespass alleged." Entry of June 27, 1988, at 5. The City contends that the dismissal was wrongful because of Judge Dillin's "erroneous view of the intent required for trespass liability." City Br. at 39. However, to support his ruling, the district judge relied on *Hawke v. Maus*, 141 Ind.App. 126, 226 N.E.2d 713, 716 (1967), which expressly stated that "it is not necessary that the trespasser intend to commit a trespass." Rather the Appellate Court of Indiana explained that "it is required for trespass that there be an intentional act and an intent to do the very act which results in the trespass." *Id.* This seemingly accords with the Restatement of Torts, which in pertinent part only imposes liability for trespass if the actor *"intentionally ... enters land in the possession of the other, or causes a thing or a third person to do so,...."* Restatement of Torts (Second) § 158(a) (emphasis supplied). To this extent intent is required.

In its brief, the City quotes Comment *i* to Section 158(a). The four illustrations in this Comment all require the actor's intent. And as explained in Comment *j*, there is no liability where a defendant has caused entry of a third person (here Westinghouse) unless the actor (here Monsanto) intentionally causes the third person to enter land by command, request, or physical duress. When Monsanto sold the PCBs to Westinghouse, Monsanto did not know that Westinghouse would deposit harmful waste on City property, and Monsanto certainly did not command, request, or coerce Westinghouse into doing so. Monsanto thus lacked any kind of trespassory intent.

In accordance with the Restatement principles, courts do not impose trespass liability on sellers for injuries caused by their product after it has left the ownership and possession of the sellers. *Dine v. Western Exterminating Co.*, No. 86–1857, 1988 WL 25511 (D.D.C. March 9, 1988) (chlordane and heptachlor); *National Gypsum Co.*, 637 F.Supp. at 656; *W.R. Grace & Co.*, 617 F.Supp. at 133.

Monsanto did not deposit PCB wastes in City property nor did Monsanto instruct Westinghouse to do so. Therefore, any trespass was Westinghouse's sole responsibility.

## C. Abnormally Dangerous Activity

█ The district court also dismissed Count XIV of the second amended complaint dealing with abnormally dangerous activity. Indiana recognizes the doctrine of strict liability stemming from carrying on an abnormally dangerous activity. *Enos Coal Mining Co. v. Schuchart*, 243 Ind. 692, 188 N.E.2d 406 (1963); *Erbrich Products*, 509 N.E.2d at 853. As reflected in the Restatement of Torts (Second) § 519, however, a plaintiff cannot recover unless the harm is caused by the activity of the defendant. Here the harm to the City's sewage and landfill was not caused by any abnormally dangerous activity of Monsanto but by the buyer's failure to safeguard its waste. In denying liability for an ultrahazardous activity here, the district court pointed out that Monsanto did not control the PCBs contained in Westinghouse's waste. This accords with the Restatement view because the Restatement confines strict liability to "[o]ne who carries on an abnormally dangerous activity." Restatement § 519(1). Here that definition would include Westinghouse but not Monsanto.

The City relies on *Indiana Harbor Belt Railway Co. v. American Cyanamid Co.*, 517 F.Supp. 314 (N.D.Ill.1981), to support the proposition that the manufacture of PCBs is an abnormally dangerous activity. *Indiana Harbor Belt* held that shipment of acrylonitrile, a toxic substance, was an abnormally dangerous activity. In *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200 (1984), this Court explicitly distinguished *Indiana Harbor Belt*, and held the manufacture of handguns is not an ultrahazardous activity and that there can

be no liability for merely manufacturing dangerous products.

Cases requiring liability impose liability for the ultrahazardous activity as a result of the *use* of the product. To recognize liability of a manufacturer or distributor would virtually make them the insurer for such products as explosives, hazardous chemicals or dangerous drugs even though such products are not negligently made nor contain any defects. Although such a social policy may be adopted by the legislature, it ought not to be imposed by judicial decree.

*Martin*, 743 F.2d at 1204, quoting with approval *Riordan v. Int'l Armament Corp.*, 81 L 27923 (Circuit Court Cook County, Law Division, July 21, 1983) (emphasis in original), affirmed, 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985).[6] While both *Martin* and *Indiana Harbor Belt* were decided under Illinois law, there is no indication that Indiana law differs. Rather, the Court of Appeals of Indiana, in holding that the manufacture of chlorine gas is not abnormally dangerous, employed reasoning similar to that in *Martin*, stating, "If the rule were otherwise, virtually any commercial or industrial activity involving substances which are dangerous only in the abstract automatically would be deemed as abnormally dangerous. This result would be intolerable." *Erbrich Products*, 509 N.E.2d at 856. In addition, the *Erbrich Products* court held that an activity could not be considered abnormally dangerous if the risks therefrom could be limited by the exercise of reasonable care. *Id.* The risks associated with the disposal

of PCBs could have been limited by Westinghouse's exercise of reasonable care.

The Fifth Circuit has also explored the limits of liability in this field in a cogent opinion by Judge Wisdom in *Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1265 n. 43 (5th Cir.1985):

Even if §§ 519–520 of the Restatement (Second) of Torts were applicable, it appears that the defendants could not be held liable under those sections.... The comments to § 519 demonstrate that the marketing of a consumer product is not within the purview of the kinds of activities that section was meant to encompass. In particular, comment d states that "liability arises out of the abnormal danger of the activity *itself,* and the risk that it creates, of harm to those *in the vicinity.*" Restatement (Second) of Torts § 519 comment d (1977) (emphasis added). Thus, § 519 encompasses activities that are dangerous in and of themselves and that can *directly* cause harm to those "in the vicinity," even though conducted with "the utmost care to prevent the harm." *Id.* The storage of dynamite in a city is one paradigm given in comment e. The marketing of a handgun is not dangerous in and of itself, and when injury occurs, it is not the direct result of the sale itself, but rather the result of actions taken by a third party.

As in *Martin*, we are unwilling to extend the doctrine of strict liability for an abnormally dangerous activity to the party whose activity did not cause the injury.[7] And, consistent with *Erbrich Products*, the

---

**6.** The Court of Appeals of the District of Columbia has recently adopted this result. *Delahanty v. Hinckley*, 564 A.2d 758 (D.C.Ct.App., 1989),:
The marketing of a hand gun is not dangerous in and of itself, and when injury occurs, it is not the direct result of the sale, but rather the result of actions taken by a third party. Furthermore, hand gun marketing cannot be classified as abnormally dangerous by applying the factors of Section 520. For example, any high degree of risk of harm, or any likelihood that such harm will be great, would result from the use, not the marketing as such, of hand guns.

**7.** No court has held that the manufacture of PCBs is an abnormally dangerous activity. Apparently only two courts, neither addressing al-

legations against a manufacturer of PCBs, have considered the application of strict liability for abnormally dangerous activities to PCBs. In the first of these cases, *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989), the court, applying New Jersey law, held that the question of whether *disposal* of PCBs was an abnormally dangerous activity was one for the jury. Similarly, in the second case, *Ahrens v. The Superior Court of the City and County of San Francisco,* 197 Cal.App.3d 1134, 243 Cal.Rptr. 420 (1st Dist.1988), the court held that the question of whether the use of PCB-containing transformers in urban office buildings was an abnormally dangerous activity was a question for the jury.

manufacture of PCBs cannot be considered abnormally dangerous under Indiana law since the risks therefrom could have been limited by Westinghouse's reasonable care. Finally, as in *Perkins*, the marketing of the PCBs was not dangerous itself, and the injury was rather the result of actions taken by a third party. The district court was correct in dismissing Count IV of the second amended complaint.

### III. Denial of Motion to File Third Amended Complaint

■ The City's proposed third amended complaint was presented two days after the court had dismissed the Counts of the second amended complaint based on nuisance, trespass, and abnormally dangerous activity.[8] The third amended complaint, however, did not materially alter the prior pleading, but merely repeated factual materials that had already been considered by the trial court, stating at the end of each Count that these facts created liability. Because the proposed pleading did not assert new contentions or depend upon new evidence, there was no need to permit its filing. *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir.1983).

### IV. Response to Dissent

The dissent argues that reliance on *National Gypsum* and *W. R. Grace*, which were decided under New Hampshire law, is inconsistent with Indiana law. New Hampshire has never adopted the Restatement of Torts (Second) with respect to nuisance liability. Contrary to the assertion in the dissent, neither has Indiana, even "in large measure." Rather, Indiana evaluates nuisance claims under the statute cited by the dissent at 13 n. 1. The language of this statute is nearly identical to the language used to define nuisance in *National Gypsum:* "the term includes everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." *National Gypsum*, 637

F.Supp. at 656. This similarity in language, added to the fact that neither New Hampshire nor Indiana has adopted the Restatement of Torts (Second) with respect to nuisance liability, lends credence to the assertion that Judge Dillin "justifiably relied" on *National Gypsum* in dismissing the nuisance claim against Monsanto.

The dissent also argues that the City should have been allowed to proceed with its case, at least to the summary judgment stage. The dissent twice concedes that it is doubtful that Bloomington's dismissed claims would have survived summary judgment. In fact Judge Dillin's decision to dismiss the nuisance, trespass, and abnormally dangerous activity claims was based not only on the pleadings but also on more detailed allegations and evidence contained in the parties' statements of contentions and exhibits. Entry of June 27, 1988, at 3. Thus it is apparent that regardless of the label applied, Bloomington had ample opportunity to inform the court of the evidence it proposed to adduce at trial. Finally, the dissent suggests that this opinion sets a "potentially dangerous precedent" by insulating sellers from liability regardless of their activities before or after the sale of their product. Regardless of whether the touchstone for liability is control or substantial participation, it seems incongruous to penalize a manufacturer and seller for his good faith efforts to limit the potentially hazardous effects of his product once it has left his plant. The dissent suggests that had Monsanto done less, had they merely sold their product and walked away, they would have been less blameworthy. This seems to us a far more dangerous approach than that taken by this opinion.

Judgment affirmed.

CUDAHY, Circuit Judge, dissenting:

Although I am doubtful that the City can press its claims against Monsanto successfully, I certainly believe it has stated a cause of action. In my view, the district

---

**8.** The court also dismissed the RICO Counts of the second amended complaint, but the City does not contend this was erroneous.

court erred when it dismissed the City's nuisance and abnormally dangerous activity claims for failure to assert Monsanto's "authority or actual physical control to direct the use or disposal of its product past the point of sale." Appellant's App. at 4. I do not agree that a defendant must have the "final say" over the disposition of the harmful agent in order to face liability under either a nuisance or an abnormally dangerous activity theory of recovery. This is not the law under the Restatement, nor the law of Indiana (which in large measure follows the Restatement).[1] Instead, the operative concept (and the one generic to the law of tort) is that of "participation." *See MacMillan Co. v. I.V.O.W. Corp.*, 495 F.Supp. 1134, 1146 (D.Vt.1980) (applying "the basic common law doctrine that one who knowingly participates in, or furthers a tortious act, is jointly and severally liable with the prime tortfeasor."); *see generally* S. Speiser, C. Krause & A. Gans,

1 *The American Law of Torts* § 3:4 (1983).[2]

It is clear from the language of section 834 of the Restatement that a plaintiff need show only that the defendant "participate[d] to a substantial extent" in carrying on the nuisance-causing activity. *See Massachusetts v. Pace*, 616 F.Supp. 815, 821 (D.Mass.1985) (following section 834); *Page County Appliance Center v. Honeywell*, 347 N.W.2d 171, 176 (Iowa 1984) (same).[3] The majority evidently concedes this point, *see* majority op. at 614 & n. 5, yet nevertheless approves the district court's application of non-Indiana precedent, created by federal district courts sitting in diversity jurisdiction, to support the proposition that the plaintiff must prove the defendant's "authority or actual physical control" over the nuisance-causing agent. *See id.* at 614 n. 4. Those cases conflict with the Restatement and, I believe, with Indiana law.[4]

---

1. The Indiana nuisance statute states that "[w]hatever is injurious to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action." Ind.Code Ann. § 34–1–52–1 (Burns 1986).

   Indiana follows the Restatement (Second) of Torts, section 519, in its definition of "abnormally dangerous activity." *See Erbrich Prods. Co. v. Wills*, 509 N.E.2d 850, 853 (Ind.Ct.App. 1987). Section 519 provides:

   (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

   (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

2. It also appears clear that a showing of participation is all that is needed to maintain a cause of action in trespass against a defendant. Sections 875 and 876 of the Restatement conclude that concert of action liability may be applied to any action in tort. The authors of the Restatement did withhold an opinion as to whether a concert of action theory would be available in tort claims not requiring a showing of intent or fault. Nevertheless, logic, together with the substantial development of tort law during the years since the Restatement was published,

   seems to validate recognition of concert of action theories in all types of tort actions.

3. In its reply to the dissent, the majority observes that the New Hampshire nuisance law at issue in both *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646 (D.R.I.1986), and *Town of Hooksett School Dist. v. W.R. Grace & Co.*, 617 F.Supp. 126 (D.N.H.1984), is quite similar to the language of the Indiana statute, cited purely for convenience *supra*, at note 1 of this dissent. Likewise, the Iowa nuisance statute virtually replicates the language of the Indiana law. *See* Iowa Code ch. 657.1 (West 1987). Nevertheless, the Iowa Supreme Court adheres to Restatement section 834. *See Page County Appliance Center*, 347 N.W.2d at 176. Since these statutes merely define nuisance and do not speak in any way to the applicability of section 834, I do not perceive the relevance which the majority attaches to the similarity between the Indiana and New Hampshire nuisance provisions.

4. The majority also errs in saying that the "uncontested record shows that when alerted to the risks associated with PCBs, Monsanto made every effort to have Westinghouse dispose of the chemicals safely." Majority op. at 614. This point is not "uncontested" because the City hotly disagrees as to the "immediacy" with which Monsanto informed its customers of the hazards of PCBs and questions Monsanto's even longer delay in imparting its knowledge to the City. The City also disputes Monsanto's claims of

In *Erbrich Products Co. v. Wills*, 509 N.E.2d 850, 853 (Ind.Ct.App.1987), unfortunately the only Indiana case from which we can draw guidance on this issue, the Indiana Court of Appeals for the First District explicitly embraced and applied the Restatement's test for abnormally dangerous activities.[5] The court reiterated a pronouncement by the Indiana Supreme Court that sections 519 and 520 must be applied on a *case-by-case* basis. *Id.* at 853 (emphasis added). The district court in this case did not even attempt to apply the section 520 test to Westinghouse's PCB disposal practices, finding that Monsanto could not in any event be held liable because it lacked "authority or actual physical control" over the PCBs bought from it by Westinghouse. While a federal court sitting in diversity jurisdiction must sometimes predict the course of state law where the law is unclear, it cannot be seriously disputed that a federal court *must* follow unambiguous state law. In the case before us, the district court eschewed clear Indiana precedent adopting section 520 and instead created its own criteria, without any basis in Indiana law, for assessing the adequacy of the City's abnormally dangerous activity claim.

In response to the dissent, the majority seems to suggest that "participation" and "control" amount to the same thing. The important difference, it seems to me, is that a manufacturer almost by definition cannot "control" the product past the point of sale and is therefore automatically exculpated from liability for any event after

the sale. With some possible exceptions, a manufacturer also does not "participate" in the creation of a nuisance or the carrying on of an abnormally dangerous activity merely by *selling* a product.[6] A manufacturer may, however, otherwise "participate" extensively in events subsequent to the sale and could very well incur liability under that test. Here, indeed, there are extensive allegations of the manufacturer's efforts to affect the disposition of the product after sale. I think it is entirely possible that even under the appropriate test the City's allegations would not survive summary judgment, whether because Westinghouse's disposal practices were not abnormally dangerous under section 520, or because Monsanto's "participation" in those practices was insufficient to justify liability or because of other difficulties in showing causation. But surely the City is entitled to a determination of its claims under a proper application of Indiana tort law.

It seems to me that, on the basis of the majority opinion, sellers of toxic chemicals and other dangerous substances, simply by virtue of their commercial status, become insulated from any liability—except that cognizable under a negligence or a products liability theory—beyond the point of sale for any of their activities occurring either before or after the sale. Just because Monsanto's activities here are arguably benign is not a good reason to insulate from liability all manufacturer activity, whether benign or not. This seems to me a potentially dangerous precedent, one incon-

---

good faith in implementing its PCB disposal program.

**5.** Section 520 of the Restatement sets out the factors which a court must consider in determining whether a particular activity is abnormally dangerous. Those factors are:

(a) Existence of a high degree of risk of some harm to the person, land or chattels of another;

(b) Likelihood that the harm that results from [the activity] will be great;

(c) Inability to eliminate the risk by the exercise of reasonable care;

(d) Extent to which the activity is not a matter of common usage;

(e) Inappropriateness of the activity to the place where it is carried on; and

(f) Extent to which its value to the community is out-weighed by its dangerous attributes.

**6.** Of course, the sale of an inherently or unreasonably dangerous product may expose a manufacturer to strict liability on a theory of products liability. Given the reach of products liability law, most courts would doubtless resist the creation of an identical cause of action under the rubric of "abnormally dangerous activity." However, the City explicitly disclaims that it has ever sought recovery against Monsanto on a products liability theory. *See* Appellant's Reply Brief at 19. Rather, the City argues that "[a]s an aggressive participant in *disposal and discharge* activities, Monsanto shares responsibility and liability for injury caused by those activities." *Id.* (emphasis added).

sistent with Indiana law and one from which I must respectfully dissent.