**UNITED STATES of America**

v.

**COMMONWEALTH EDISON COMPANY, Defendant.**

No. 84 C 1597.

United States District Court, N.D. Illinois, E.D.

Oct. 31, 1985.

Elizabeth Stein, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

A. Daniel Feldman, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This case for injunctive and declaratory relief concerns Commonwealth Edison's responsibility for cleaning up highly toxic polychlorinated biphenyls (PCBs) spilled from its electrical equipment, often in resi-

dential areas.[1] Edison, impliedly at least, recognizes a responsibility to clean up spills, with a dispute over the extent of that responsibility. It argues, however, that the extent of its responsibility cannot be determined through the medium of this lawsuit as the issues are presently framed. This court disagrees.

## I.

There is much to suggest that PCBs are both toxic and extremely persistent in the environment. *See* 47 Fed.Reg. 37342, 37344 (Aug. 25, 1982). The most visible effect of PCB exposure on humans is chloracne, a painful and disfiguring skin disorder. *Id.* Both prenatal and post-natal exposure to PCBs may have adverse effects on human reproduction and development. *Id.* PCBs can alter the reproductive processes in mammals, even at doses that do not otherwise cause other signs of toxicity. *Id.* Monkeys fed diets with PCB concentrations of less than ten parts per billion (ppb) have lower fertility rates and a higher incidence of stillbirths and birth defects. *See Environmental Defense Fund v. E.P.A.*, 636 F.2d 1267, 1270 (D.C.Cir. 1970). Other animal studies indicate that PCBs have an oncogenic (tumor-causing) potential. 47 Fed.Reg. at 37344. There is no evidence that this animal data is not predictive of the effects of PCBs on humans. *Id.*

PCBs also have adverse environmental effects, 47 Fed.Reg. at 37345. PCBs tend to concentrate in the aquatic environment and have a deleterious impact on a wide variety of aquatic life, ranging from phytoplankton to fish. *Id.* At sublethal levels PCB exposure lowers the reproductive success and survival rate of fish and leads to abnormalities in the development of bones and reproductive organs. *Id.* PCBs also impair the reproductive success of birds and mammals. *Id.* Concentrations below 1 ppb can impair the reproductivity of aquatic invertebrates and fish, while birds can suffer severe reproductive failure when fed diets containing only 10 ppb of PCBs. *Environmental Defense Fund,* 636 F.2d at 1270.

In addition to direct exposure, organisms can encounter harmful levels of PCBs through a process known as bioaccumulation. When a stable chemical is released into the environment bioaccumulation causes the chemical to be found at increased levels in organisms at each step up the food chain. PCBs, for example, are chemically stable and collect in waterways. They are found at relatively low levels in the unicellular phytoplankton at the bottom of the food chain. The PCBs are transferred up the food chain by the small invertebrates that consume the phytoplankton, the organisms that feed on the invertebrates, and so on, up to large fish and the humans who eat fish. The PCB level in organisms tends to increase at each step up the food chain.[2] Mammals, including humans, are at the top of the food chain and can thus accumulate relatively high levels of PCBs in their flesh even while avoiding substantial direct exposure. *See generally* 47 Fed. Reg. at 37345; *Environmental Defense Fund,* 636 F.2d at 1270.[3]

Toxic chemicals are often produced for socially beneficial purposes, and PCBs are no exception. Because of their chemical stability, fire resistance and electrical resistance properties, PCBs have been manufactured and used commercially for fifty years. *Environmental Defense Fund,* 636 F.2d at 1270. As of 1975, up to 400 million

---

**1.** This case also concerns polychlorinated dibenzofurans (PCDFs) found in Edison's electrical equipment. PCDFs are produced when PCBs are heated in the presence of oxygen. They have toxic effects similar to PCBs. References to PCBs in the opinion should be understood as also referring to PCDFs.

**2.** For example, a study cited as typical by the Environmental Defense Fund court reported that fathead minnows bioconcentrated PCBs by a factor of 230,000. 636 F.2d at 1270 n. 5.

**3.** EPA regulations covering PCBs suggest the seriousness of the health threat posed by PCBs. They define a "significant exposure" to PCBs as "any exposure to human beings or the environment to PCBs as measured by any scientifically acceptable analytical method." 40 C.F.R. § 761.3.

pounds of PCBs had entered the environment. *Id.* Approximately 25 to 30 per cent of this amount, or at least 100 million pounds, is free and circulating in the environment and is a direct source of contamination for wildlife and humans. *Id.*

Because of their fire resistance, PCBs are used extensively by electric utilities in transformers and capacitors. Transformers are used to transmit and distribute electric power efficiently. 47 Fed.Reg. at 37345. A small percentage of transformers known as PCB transformers are filled with a dielectric fluid containing between 60 and 70 per cent PCBs. *Id.* PCB transformers are located in secure indoor locations and electrical substations and are not at issue in this case. *Id.* Other transformers contain mineral oil dielectric fluid and have become contaminated with PCBs during manufacturing and servicing. *Id.* These mineral oil transformers are mounted on poles throughout electric service areas. This type of transformer is involved in this case. At the end of 1981 the electrical utility industry accounted for 20 million of the 25 million mineral oil transformers in use. *Id.* at 37345.

Mineral oil transformers account for only a small percentage of the PCBs released into the environment. Each year only .007 per cent of such transformers develop leaks that result in a PCB concentration of 50 parts per million (ppm) or more in the immediate surrounding area. 47 Fed.Reg. at 17430 (April 22, 1982). PCB releases from such transformers amount to 826 pounds annually, 0.21 per cent of the total amount released from electric utility equipment. *Id.* at 17428.[4]

Capacitors are devices for improving the voltage and power factor of electrical power systems. They are mounted on utility poles and contain more than 3 pounds of dielectric fluid. 47 Fed.Reg. at 37347. Virtually all capacitors manufactured before 1978 were filled with a dielectric fluid with a PCB concentration near 100 per cent. *Id.* At the end of 1981 electric utilities had 2,800,000 capacitors in service. *Id.* at 37347–48.[5]

Only .009 per cent of capacitors develop leaks each year that result in the contamination of 50 ppm or more of PCBs in the area immediately surrounding the spill. 47 Fed.Reg. at 17434. Capacitor leaks, however, amount in all to 369,251 pounds of PCBs each year. *Id.* at 17428. This amount represents 94.5 per cent of total annual PCB releases from electric utility equipment into the environment. *Id.* Unlike transformer leaks, however, which usually develop slowly as gaskets deteriorate, 47 Fed.Reg. at 17432, capacitors often rupture unexpectedly. About 63 per cent of the PCB capacitor spills result from the rupture of the capacitor cases. *Id.* These ruptures can spread large quantities of PCBs directly into the environment over a large area. *Id.*

Edison has approximately 40,000 capacitors containing dielectric fluid with concentrations of PCBs in excess of 500 ppm (Ans. ¶ 5). The number of its pole-mounted mineral oil transformers and the level of PCBs in their dielectric fluid is unclear (Ans. ¶ 6). Between 60 and 100 of Edison's capacitors rupture each year, with 100 ruptures occurring in 1983 (Ans. ¶ 10). The number of transformer leaks has yet to be established (Ans. ¶ 11).

The government's complaint focuses on seven capacitor ruptures and Edison's response to the PCB contamination that resulted. According to the complaint, the seven cases followed a similar pattern. PCBs were sprayed around residential areas as a result of a capacitor rupture. Edison's cleanup effort, often undertaken af-

---

4. Twelve per cent of PCB transformers, however, show signs of "small" leaks, and four per cent show signs of "moderate" leaks each year. 47 Fed.Reg. at 17430. PCB releases from such transformers total 20,448 pounds annually or 5.2 per cent of the total amount released from electrical equipment. *Id.* at 17428.

5. Approximately 500 million small capacitors, each containing between 0.1 and 0.6 pounds of PCBs were in use as of the middle of 1982. 47 Fed.Reg. at 37349. Unlike the large capacitors used by electric utilities, these small capacitors are not regulated or at issue in this case.

ter substantial delay, was limited to removing visible traces of the spilled dielectric oil. Edison did not then test the sites to determine the effectiveness·of the cleanup. Subsequent tests by the EPA determined that the sites remained contaminated, with PCB levels as high as 33,520 ppm. At least two individuals suffered skin rashes as a result of direct exposure to the spilled PCBs and others were left with measurable amounts of PCBs in their blood.

## II.

In response to the dangers associated with the use of PCBs and other toxic chemicals, Congress enacted the Toxic Substances Control Act (TSCA), Pub.L. No. 94–469, 90 Stat. 2003 *et seq.* (1976). While the Act is directed at hazardous chemicals generally, PCBs are singled out for special attention in section 6(e) of the Act, 15 U.S.C. § 2605(e). No other chemical is covered by name in the Act. The special attention given PCBs in the Act resulted from congressional recognition of the extreme threat PCBs pose to human health and the environment. *See generally Environmental Defense Fund,* 636 F.2d at 1271.

Section 6(e) sets out a detailed plan to dispose of PCBs, to phase out the manufacture, processing and distribution of PCBs, and to limit the use of PCBs. Within six months of the effective date of the Act (Jan. 1, 1977), the Environmental Protection Agency (EPA) was required to prescribe methods to dispose of PCBs and mandate the labeling of PCB containers. 15 U.S.C. § 2605(e)(1). Beginning one year after the effective date, PCBs could only be manufactured, processed, distributed and used in a "totally enclosed manner." Section 2605(e)(2)(A). Two years after the effective date all manufacture of PCBs was prohibited, § 2605(e)(3)(A)(i), and two and one-half years after the effective date all processing and distribution of PCBs in commerce was prohibited, § 2605(e)(3)(A)(ii).

Section 6(e) does contain exceptions to these prohibitions. The EPA administrator is permitted to authorize the use of PCBs in a non-totally enclosed manner if the proposed use would "not present an unreasonable risk of injury to health or the environment," § 2605(e)(2)(B). A parallel provision permits the manufacture, processing and distribution of PCBs under some circumstances, § 2605(e)(3)(B). Presumably to ensure maximum regulatory effectiveness, Congress provided that

> [t]his subsection does not limit the authority of the [EPA] Administrator, under any other provision of this chapter or any other Federal law, to take action respecting any polychlorinated biphenol.

Section 2605(e)(5).

The EPA initially classified capacitors and mineral oil transformers as "totally enclosed," automatically exempting them from regulation. The Court of Appeals of the District of Columbia Circuit found no substantial evidence in the record to support this classification and remanded the proposed regulations to the EPA for further proceedings. *Environmental Defense Fund,* 636 F.2d at 1284–1286. The EPA proposed new regulations with respect to transformers and capacitors on April 22, 1982. *See* 47 Fed.Reg. 17426 *et seq.* It promulgated these regulations in final form on August 25, 1982. *See* 47 Fed.Reg. 37342 *et seq.*

The regulations result from the EPA's balancing the health and environmental risks posed by the continued use of PCBs in transformers and capacitors against the cost of various regulatory alternatives. The regulations permit the continued use of mineral oil transformers for the remainder of their useful life. 40 C.F.R. § 761.-30(a). The regulations also permit the continued use without restriction of capacitors on outside poles until October 1, 1988. Section 761.30(1). At that point pole-mounted capacitors are banned. Section 761.-30(1)(ii).

In addition to restrictions on the use of various kinds of electrical equipment, the regulations prescribe detailed requirements for the disposal of PCBs. These requirements cover the disposal of PCBs generally, § 761.60(a)(1), mineral oil dielectric

fluid, § 761.60(a)(2), non-liquid PCBs in the form of contaminated soil, rags or other debris, § 761.60(a)(4), PCB capacitors, § 761.60(b)(2), and PCB-contaminated electrical equipment, § 761.60(b)(4). Disposal is by incineration, § 761.70, or by confinement in a chemical waste landfill, § 761.75.

The regulations emphasize that the spillage of PCBs is a form of disposal. In the definitions section of the regulations, "disposal" is defined as including spills and leaks:

> "Disposal" means intentionally or accidentally to discard, throw away or otherwise complete or terminate the useful life of PCBs and PCB Items. Disposal includes spills, leaks, and other uncontrolled discharges of PCBs as well as actions related to containing, transporting, destroying, degrading, decontaminating, or confining PCBs and PCB Items.

40 C.F.R. § 761.3. In the section outlining disposal requirements for a wide variety of items, "spills" are included as a form of disposal:

> *Spills.*
>
> (1) Spills, leaks and other uncontrolled discharges of PCBs constitute the disposal of PCBs.
>
> (2) PCBs resulting from the cleanup and removal of spills, leaks, or other uncontrolled discharges, must be stored

and disposed of in accordance with paragraph (a) of this section.

40 C.F.R. § 761.60(g).[6]

The regulations do not prescribe any method of cleaning up spills from mineral oil transformers or capacitors.[7] The regulations also do not contain any explicit standards for the extent of the cleanup required after the spill or leak of PCBs from electrical equipment. The draft regulations had contained such cleanup standards. 47 Fed.Reg. at 17441. These regulations would have required cleanups to pre-spill PCB levels where the spill posed a threat of contamination to water, food, feed or humans, and a cleanup to levels under 50 ppm otherwise. *Id.*[8]

In its announcement of the final PCB regulations, the EPA discussed its disposal requirements in the event of a spill and, in a cryptic passage, stated why the cleanup standard had been dropped:

> The proposal also contained requirements for cleanup of PCB contamination resulting from spills, leaks, and other uncontrolled discharges of PCBs. Comments in response to these provisions varied. Some comments stated that a requirement for level of cleanup should be set, but that cleanup to a concentration of 50 ppm was always appropriate. Other comments expressed concern about setting any specific requirements for level of cleanup at this time and about how these levels would be deter-

---

**6.** The EPA recently changed the definition of spills as a form of disposal, to read:

> Spills and other uncontrolled discharges of PCBs at concentrations of 50 ppm or greater constitute the disposal of PCBs.

*See* 40 Fed.Reg. 28191 (July 10, 1984).

**7.** The regulations do mandate certain steps in the case of leaks from PCB transformers. 40 C.F.R. § 761.30(a)(1)(iii). If a PCB transformer is found to have a leak which results in any quantity of PCBs running off or being about to run off the external surface of the transformer, then the transformer must be repaired or replaced to eliminate the source of the leak. In all cases any leaking material must be cleaned up and properly disposed of according to disposal requirements of sec. 761.60. Cleanup of the released PCBs must be initiated as soon as possible, but in no case later than 48 hours of its

discovery. Until appropriate action is completed, any active leak of PCBs must be contained to prevent exposure of humans or the environment and inspected daily to verify containment of the leak.

**8.** The proposed cleanup standard read in part as follows:

> Except as provided in paragraph (d)(3)(ii), of this section, contaminated material resulting from spills, leaks, and other uncontrolled discharges must be cleaned up to preexisting background levels of PCBs where there is a risk of exposure to water, human food or animal feed. Any visible signs of PCB contaminate must be removed. In all cases cleanup of PCB contaminated materials, below 50 ppm PCBs is required.

47 Fed.Reg. at 17443.

mined in the field. Still others approved of the standards set in the proposed rule.

The Agency has decided not to include language regarding the required level of cleanup in this final rule.

47 Fed.Reg. at 37354.

### III.

The government has pleaded two claims with respect to each of the seven incidents of PCB contamination covered in the complaint. In the odd-numbered counts the government claims that Edison violated the PCB regulations promulgated by the EPA pursuant to 15 U.S.C. § 2605. In the even-numbered counts the government claims that the dielectric fluid containing PCBs spilled from Edison's transformers and capacitors is an "imminently hazardous chemical substance" under 15 U.S.C. § 2606.

The government seeks an order compelling Edison to submit a list of sites where there have been known or suspected discharges of PCB-contaminated dielectric fluid, to initiate a program of sampling and laboratory analysis to evaluate the extent of PCB contamination at each spill site, and to provide detailed results of each analysis to the owner and occupant of the affected property. It also seeks to compel Edison to clean up each of the sites contaminated by PCBs, using methods designed to minimize human exposure and to limit the spread of PCBs into the environment. Finally, the government seeks an order declaring that "Edison has a duty to remove all PCB ... contamination resulting from any future discharge of dielectric fluid from Edison's PCB capacitors, transformers and other PCB electrical equipment."

The TSCA makes it unlawful to fail or refuse to comply with the requirements of § 2605 or EPA regulations promulgated thereunder, 15 U.S.C. § 2614(1). It gives district courts jurisdiction over civil actions to, *inter alia*, (1) restrain any violation of § 2614, (2) restrain action prohibited by § 2605 or applicable regulations, and (3) compel any action required by or under the TSCA, 15 U.S.C. § 2616. The parties agree that § 2616 gives this court jurisdiction over counts 1, 3, 5, 7, 9, 11 and 13.

The more difficult question is whether the government can proceed under § 2606. That section permits the EPA administrator to bring an action in district court for relief ... against any person who manufactures, processes, distributes in commerce, or uses, or disposes of, an imminently hazardous chemical substance or mixture or any other article containing such a substance or mixture. 15 U.S.C. § 2606(a)(1)(B). The statute defines "imminently hazardous chemical substance or mixture" as

a chemical substance or mixture which presents an imminent and unreasonable risk of serious or widespread injury to health or the environment. Such a risk to health or the environment shall be considered imminent if it is shown that the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture, or that any combination of such activities, is likely to result in such injury to health or the environment before a final rule under section 2606(f) of this title can protect against such risk.

15 U.S.C. § 2606(f).

The EPA may commence a civil action under § 2606 "notwithstanding the existence of a regulation or the pendency of any administrative or judicial proceeding." 15 U.S.C. § 2606(a)(1). Section 2606(b) authorizes the district court to grant temporary or permanent relief "necessary to protect health or the environment from the unreasonable risk associated with the chemical substance," § 2606(b).

Edison's position is that dielectric fluid containing PCBs cannot be considered "imminently hazardous" as a matter of law and thus § 2606 is inapplicable. It points out that "imminently hazardous" is defined with reference to whether a chemical substance "is likely to result in ... injury to health or the environment before a final rule under § 2605 ... can protect against such risk." Section 2606(f). Because the EPA promulgated regulations three years

ago that permit the continued use of dielectric fluid containing PCBs in transformers and capacitors, Edison argues that a final rule already exists that protects against the risk of PCB contamination from leaks and spillages. But that position rests upon a *non sequitur*. That use of PCBs in nonruptured enclosures may not be "imminently hazardous," does not mean that the continuing presence of PCBs in the environment as a result of uncontrolled spills, however inevitable such spills may be, is equally tolerable.

■ The government's case under § 2606 is a narrow one. It seeks to establish that PCBs spilled in residential areas constitute an unusually great health risk and to compel Edison to clean up those areas contaminated by malfunctioning electrical equipment. Obviously, the government would not come into federal court to compel Edison to disclose where PCB spills have occurred and to clean up those sites if existing regulations forced Edison to keep public records of spills, to clean up spill sites and to inform unsuspecting residents of the extent of the PCB contamination.

■ Section 2606's definition of "imminently hazardous chemical substance" explicitly distinguishes between "use" and "disposal". While the regulations are directed primarily at the "use" of PCBs in electrical equipment, the government's action is directed at a certain form of "disposal"—spills from rupturing electrical equipment. The existence of regulations governing the disposal of PCBs, *see* 40 C.F.R. §§ 761.60, 761.70, do not preempt an action under § 2606. First, the disposal regulations do not focus on the specific problem the government seeks to redress. Second, the government may bring an action against an imminent hazard notwithstanding the existence of a regulation. *See* § 2606(a).

■ The imminence of the hazard posed by the use or disposal of a chemical is defined in part with reference to the likelihood that the injury will occur before a regulation can be promulgated to protect against the harm, § 2606(f). This does not mean that the EPA administrator can bring an action under § 2606 only when a regulation is to be promulgated. Rather, § 2606 is best viewed as a complement to § 2616. Section 2616 permits the government to bring an action for violation of existing regulations. Section 2606 permits the government to close regulatory loopholes by taking action against applications of toxic chemicals whose health and environmental risks are not sufficiently minimized by the regulatory scheme. Requiring the EPA to couple new regulations with every § 2606 action would both complicate enforcement efforts and lead to an ever-growing regulatory scheme of impenetrable complexity.

By bringing an action under § 2606 rather than § 2616 the government presumptively establishes that the regulatory scheme is incomplete. The primary focus of a § 2606 case should be upon the seriousness of the real or threatened hazard posed by a toxic chemical or the particular application of a toxic chemical. The requirement that the government establish that the health or environmental threat is both (1) imminent and (2) commensurate to that posed by other substances covered by the TSCA ("unreasonable risk"), protects regulated companies from the arbitrary or frivolous enforcement efforts that Edison fears.

### IV.

Edison does not mount a jurisdictional attack on the counts brought under § 2616. It does advance two arguments for summary judgment on these counts.

The first argument is that the government is seeking an order that would require Edison to clean up "all" spilled PCBs. Interpreting "all" to mean each and every molecule of spilled PCBs, and pointing out that such a cleanup is practically impossible, Edison argues that this court would be ordering the doing of an impossible act by

granting the relief purportedly sought by the government.[9]

■ This argument fails for two reasons. First, prayers for relief should be construed reasonably. When its prayer for relief is read in the context of the allegations in the complaint, it is clear that the government seeks to compel Edison to clean up spill sites to the extent necessary to protect human health and the environment. The government's failure to specify precise cleanup standards undoubtedly stems from the absence of regulatory standards and, more importantly, from its recognition that ongoing research about the health effects of PCBs and developments in cleanup technology may alter the definition of what constitutes an adequate cleanup. Second, the government expressly disclaims any intention of forcing Edison to clean up each and every molecule of spilled PCBs.

■ Edison's second argument rests upon two facts. The first is that the EPA has permitted the continued use of dielectric fluid containing PCBs even while recognizing that some spills will occur. The second is that the regulations do not specifically mandate a cleanup of "all" PCBs. Indeed, the EPA dropped a cleanup standard from the final regulations. Edison asserts that the legal implication to be drawn from these facts is that it has no obligation under the TCSA to clean up all PCBs and therefore is entitled to summary judgment on a claim that it does.

The regulatory scheme, however, clearly presupposes thorough cleanups after spills. The regulations set out detailed disposal requirements, 40 C.F.R. § 761.60. Spills and leaks are defined in § 761.60(d)(1) as forms of disposal that must comply with the regulatory standards. *See* § 761.-60(d)(1). Subsection (2), immediately following, reads, "PCBs *resulting from the cleanup* and removal of spills, leaks and other uncontrolled discharge, *must* be stored and disposed of in accordance with [§ 761.60(a)]." Section 761.60(b)(2) (emphasis added).

The regulations also set out disposal requirements for "any non-liquid PCBs in the form of contaminated soil, rags or other debris." Section 761.60(4). *See also* § 761.60(a)(2) (dielectric mineral oil). These contaminated materials must be disposed of by incineration, § 761.70, or in chemical waste landfills, § 761.75. The regulations prescribe extremely strict incineration and landfill standards to ensure minimal PCB releases to the environment. *See also* § 761.65 (storage for disposal).

The regulatory scheme does not necessarily require the disposal of all PCBs, but it may not fall far short of that. Strict cleanup requirements can easily be derived from the regulations. For example, by treating spills as a form of disposal the EPA may in effect be requiring cleanups to be as thorough as the disposal methods. For example, if incineration must destroy all but 0.001 grams of PCBs per kilogram of PCB burned, *see e.g.*, § 761.70(b)(1), perhaps cleanups of dielectric spills must be equally efficient.[10] Edison quite reasonably complains that it is impossible to deal with a cleanup standard which EPA has yet to articulate, and it may well be entitled to specific responses to contention interrogatories. It can be said with assurance, however, that Edison cannot rely upon the TSCA and accompanying regulations to avoid or severely curtail a responsibility to

---

9. Edison offers an affidavit which states that cleanups are not 100 per cent effective. It appears that it is possible to quite thoroughly clean up spills, however. Regulations proposed but later withdrawn by the EPA provided that many spills would have to be cleaned up to preexisting background levels. *See* 47 Fed.Reg. at 17441. Such a standard presupposes the existence of sophisticated measuring and cleanup technology. Interestingly enough, such a standard in effect would have required Edison to clean up an amount of PCBs equal to *all* the

PCB spilled from its equipment. Otherwise, preexisting background levels of PCBs could not be reached.

10. This court does not suggest that such a stringent cleanup standard for dielectric oil spills is necessarily indicated. Rather, it engages in the derivation of the standard to illustrate that the regulatory scheme is strongly consistent in more than one way with a cleanup requirement.

clean up PCBs spilled from its equipment solely because EPA, in relying upon its regulations, prays for a cleanup of all PCBs.

## V.

■ The government has moved for summary judgment on the counts based on 2616. Summary judgment, however, is premature. Having disavowed the position that Edison is required to clean up literally "all" the PCBs from each spill, the government cannot not now prevail simply by pointing out that Edison's cleanup efforts are not 100 per cent effective. Rather, the government has the burden of showing that under the circumstances Edison's cleanup efforts failed to satisfy disposal standards.

Further discovery and trial will be necessary to formulate disposal standards applicable to the type of spills here and to establish whether Edison has properly cleaned up existing PCBs spill sites. Such determinations are dependent upon up-to-date information about the health and environmental hazards posed by PCBs and the available cleanup technology. The PCB regulations indicate that with the assistance of the parties this court must establish what are "adequate cleanup measures" under the circumstances. 47 Fed.Reg. at 37354.

■ Edison argues that this court is bound by a determination of an administrative law judge in a parallel proceeding that Edison is not liable under the TSCA if it initiates "adequate" cleanups within 48 hours of a spill. *In re Commonwealth Edison*, (TSCA–V–C–133, 12/1/83) (on motion to dismiss an enforcement action seeking sanctions rather than prospective relief). This is a rather curious position. The same administrative law judge summarily rejected Edison's argument that the absence of specific regulatory standards

exempted Edison from any liability for inadequate PCB cleanups. *Id.* at 3. Edison not surprisingly does not argue that this determination has a preclusive effect. While this court will likely give some weight to pertinent administrative decisions, Edison's selective *res judicata* approach must be rejected.[11] The immediate, and for the moment dispositive, answer is that there has been no final agency action binding upon the parties.

Edison also seeks to bifurcate this proceeding and try the remedy issue first. Apparently bifurcation would permit Edison to determine the cost of cleanup if it is found liable. Knowing the cost, it might decide to forego litigating the liability issue.

■ Bifurcation offers only a speculative chance that trial on the liability issue can be entirely avoided. The liability and remedy issues are intertwined here. This court recognizes that the core dispute is the extent of Edison's cleanup responsibility. The determination of what constitutes an adequate cleanup will require close attention to the same facts upon which Edison's liability, if any, will be assessed. One questions, however, whether full litigation of the circumstances of every alleged spill is necessary to a resolution of that core dispute, even though an exploration of the circumstances of one or more will probably be helpful to that resolution.

### *Conclusion*

All motions are denied.

---

11. Edison also does not suggest that this court give special weight to another administrative decision in a case presenting similar issues. *See In the Matter of General Electric, Aircraft Engine Group*, (No. TSCA–V–C–147 1/27/84). That de-cision rejected a 50 ppm cutoff for PCB cleanups and appeared to embrace a requirement that PCBs be removed to the lowest level below 50 ppm which is practicable through the use of normal cleaning methods. *Id.* at 8–16.