[No. A038708. First Dist., Div. One. Jan. 22, 1988.]

PAUL AHRENS et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in
Interest.

**COUNSEL**

William R. Benz and Yvonne M. Metzger for Petitioner.

No appearance for Respondent.

Sedgwick, Detert, Moran & Arnold, Stephen W. Jones, Roger D. Rizzo, Beth S. Jordan Donna J. Genesis and Iathan T. Annand for Real Party in Interest.

Latham & Watkins, Ernest J. Getto, Milton A. Miller, Juli Wilson Marshall, David F. Zoll, Michael P. Walls, Crosby, Heafey, Roach & May, Peter W. Davis, Piper & Marbury, Toni K. Allen and Susan D. Sawtelle as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**RACANELLI, P. J.**—Petitioners filed this action against Pacific Gas and Electric Company (PG&E) and others following a fire in an electrical transformer containing polychlorinated biphenyls (PCB's) at a San Francisco high-rise office building in May 1983. Summary adjudication of issues was granted in favor of PG&E, primarily on the issue of whether the use of electrical transformers containing PCB's constitutes an ultrahazardous activity. Additionally, the court determined to be without substantial controversy the issues whether PG&E was involved in a conspiracy to misrepresent facts surrounding the cleanup following the fire and whether PG&E was involved in tissue and blood sampling performed on the petitioners.

Petitioners seek a writ of mandate commanding the superior court to set aside its order granting real party's motion for summary adjudication of issues. We will grant relief in part for the reasons which we explain.

### Factual Background

The facts, as contained in the documents before the trial court, are as follows. Petitioners were employed at One Market Plaza, an office high-rise owned by Equitable Life Assurance Company and Southern Pacific Transportation Company. PG&E owned and maintained electrical transformers which contained PCB's, used as an insulating material, housed in a vault beneath the street and the office building.[1] On May 15, 1983, the transformers exploded and burned, causing the release of soot, smoke, and toxic substances caused by combustion of the PCB's.[2] Petitioners were exposed to the toxic substances at the time of the fire, as well as during and after the resulting cleanup.

---

[1] We note that restrictions on the use of PCB's in general began to be enacted as early as 1973. (*Monsanto Co.* v. *Miller* (Ind.App. 1983) 455 N.E.2d 392, 395.) The federal Toxic Substances Control Act of 1976 prohibits the manufacture or use of PCB's after January 1, 1977, except in a totally enclosed manner. (15 U.S.C. § 2605(e)(2)(A) (1976).) No other section of the act addresses a specific toxic substance.

When the EPA issued regulations defining transformers as "totally enclosed" and, therefore, exempt from regulation, the District of Columbia Court of Appeals invalidated the regulations. (*Env. Def. Fund* v. *Env. Prot. Agency* (1980) 205 App.D.C. 139 [636 F.2d 1267].) In a subsequent rulemaking proceeding, the agency noted the existence of information showing that PCB's present a hazard to the environment, as well as potential for reproductive effects, developmental toxicity and oncogenic effects in humans. (47 Fed.Reg. 37344-37345 (Aug. 25, 1982).)

The EPA review of PCB's in electrical transformers eventually culminated with the prohibition of PCB network transformers, such as the ones at issue in this case, in or near commercial buildings by October 1, 1990. (50 Fed.Reg. 29199 (July 17, 1985).)

[2] Polychlorinated dibenzodioxins (PCDD's) and polychlorinated dibenzofurans (PCDF's) are among the toxic substances formed during fires involving PCB's. (50 Fed.Reg. 29171 (July 17, 1985).)

## Procedural History

On November 18, 1983, petitioners filed a complaint for damages for injuries caused by toxic substance contamination. In addition to PG&E, the building owners, and the manufacturer of the transformer, several companies involved in the postfire cleanup, health monitoring, and testing were named as defendants in the complaint and two subsequent amendments.

On February 24, 1987, petitioners moved for summary adjudication of issues as to whether using, maintaining and operating an electrical transformer containing PCB's at a high-rise office building is an ultrahazardous activity.[3]

On February 27, PG&E also moved for summary adjudication of issues, including, inter alia, (1) whether PG&E's use of the transformers containing PCB's was an ultrahazardous activity; (2) whether PG&E was involved in a conspiracy to suppress information regarding testing, cleaning or decontamination after the fire; and (3) whether PG&E had any involvement in tissue and blood sampling performed on petitioners.[4] At the hearing on PG&E's motion on March 27, 1987, the trial court indicated that while the use of PCB's in the transformers was hazardous in the sense of having the capacity to cause harm, it was not an uncommon activity.

On April 30, 1987, the court entered its order that there was no triable issue as to any material fact regarding the following three issues: (1) "PG&E's use of electrical transformers containing PCBs at the time of the May 15, 1983 fire was not an ultrahazardous activity."

(2) "PG&E was not involved in any conspiracy to misrepresent or suppress information concerning any aspect of testing, cleaning or decontamination at One Market Plaza following the May 15, 1983 fire."

(3) "PG&E had no involvement in or connection with the tissue and blood sampling performed upon plaintiffs which is the subject of plaintiffs' ninth cause of action."

On May 11, 1987, written notice of entry of the order was served on petitioners. Their timely petition for writ of mandate pursuant to Code of Civil Procedure section 437c, subdivision (l), ensued.

---

[3] Petitioners also sought summary adjudication of whether the cleanup and decontamination constituted an ultrahazardous activity. This issue was not addressed in the subsequent PG&E motion. Like the parties and the trial court, we use the terms "ultrahazardous activity," drawn from the First Restatement of Torts, and "abnormally dangerous activity," from the Second Restatement, interchangeably in our discussion of the issues herein.

[4] Petitioners' motion was subsequently taken off calendar, pursuant to local rule 16(d), but was incorporated in the opposition to PG&E's motion, and considered by the court in that context.

## DISCUSSION

### *Standard of Review*

Our review of the challenged order is governed by the principles which follow.

■ "Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. [Citations.] The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory. [Citation.]" (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) As frequently noted, summary judgment is a drastic remedy which requires that the moving party's declarations be strictly construed, while those of the opposing party are liberally construed. (*Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714, 717 [150 Cal.Rptr. 408].) The function of summary judgment is to determine whether a triable issue of fact exists, not to pass on the merits of the issue itself. (*Jos. Schlitz Brewing Co.* v. *Downey Distributor* (1980) 109 Cal.App.3d 908, 914 [167 Cal.Rptr. 510].) In addition, a summary judgment may not be based on inferences which are contradicted by other inferences that raise a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (c).)

"Supporting and opposing affidavits or declarations shall be made . . . on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." (Code Civ. Proc., § 437c, subd. (d).) ■ Mere conclusions of law or fact are insufficient to satisfy the evidentiary requirements of the summary judgment statute. (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 626 [157 Cal.Rptr. 248].)

In determining summary motions, the court may consider admissions, answers to interrogatories, depositions and matters subject to judicial notice. (Code Civ. Proc., § 437c, subd. (b).) And judicial notice of federal regulations and documents contained in the Federal Register is mandated under Evidence Code section 451, subdivision (b). (See Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 451, pp. 180-181; *Stevens* v. *Cessna Aircraft Co.* (1981) 115 Cal.App.3d 431, 434 [170 Cal.Rptr. 925] [federal regulations established responsibilities of aircraft pilot on summary judgment]; *People* v. *International Steel Corp.* (1951) 102 Cal.App.2d Supp. 935, 939 [226 P.2d 587] [judicial notice of "Ringelmann Chart" measuring air contamination, published in Fed.Reg.].)

■ Appellate review of a trial court's order granting summary adjudication of issues requires an examination of the pleadings, the moving party's

showing, and, if necessary, the opposing party's showing in order to determine whether a triable issue of material fact exists. (*LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 744-745 [176 Cal.Rptr. 224].) In light of such governing principles, we discuss the three principal issues raised by the petition.

### Use of PCB's as an Abnormally Dangerous Activity

■ Although the question whether an activity is abnormally dangerous is one of law (*Smith* v. *Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 785 [56 Cal.Rptr. 128, 29 A.L.R.3d 538]), its resolution depends on an evaluation of several interrelated factors. (*Ibid.*; Rest.2d Torts, § 520.) The rationale supporting the imposition of strict liability for abnormally dangerous activities is " 'one of allocating a more or less inevitable loss to be charged against a complex and dangerous civilization, and liability is placed upon the party best able to shoulder it.' " (*Smith, supra,* at p. 785, quoting from Professor Prosser.)

■ PG&E argues that the activity to be analyzed is limited to the "maintenance and operation of high-voltage electric power lines and transformers." Relying primarily on *Pierce* v. *Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68 [212 Cal.Rptr. 283, 60 A.L.R.4th 709], PG&E argues that the only act in which it was engaged was the commonplace activity of supplying electrical power. We think PG&E's characterization of the question is overbroad.

In *Pierce, supra,* injury was sustained by reason of commonly known dangers associated with the transmission and supply of electricity. Here, in contrast, the focus of our inquiry is properly centered on the activity that *created* the risk of harm. Thus, the precise issue here, as properly framed, is whether the use of this type of electrical transformer containing a hazardous toxic substance in a densely populated location can be considered commonplace and within the experience of the larger community.

■ Having defined the nature of the activity to be analyzed, we look to the factors described in section 520 of the Restatement Second of Torts[5] to determine whether an activity is abnormally dangerous.[6] Because the trial

---

[5] The Restatement Second of Torts section 520 states: "In determining whether an activity is abnormally dangerous, the following factors are to be considered: [¶] "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; [¶] "(b) likelihood that the harm that results from it will be great; [¶] "(c) inability to eliminate the risk by the exercise of reasonable care; [¶] "(d) extent to which the activity is not a matter of common usage; [¶] "(e) inappropriateness of the activity to the place where it is carried on; and [¶] "(f) extent to which its value to the community is outweighed by its dangerous attributes."

[6] Whether California has completely adopted the Restatement view of abnormally dangerous activities has been the subject of scholarly comment. (See 1 Levy et al., Cal. Torts (1987)

court based its conclusion of nonultrahazardousness on its finding that the activity was one of common usage, we focus our attention specifically on that Restatement factor.

Under the Restatement view, it is not necessary that all of the factors be present in a particular case. However, "The usual dangers resulting from an activity that is one of common usage are not regarded as abnormal, even though a serious risk of harm cannot be eliminated by all reasonable care." (Rest.2d Torts, § 520, com. (i).) Thus, an activity which involves a high degree of harm, a likelihood that the resulting harm will be great and an inability to eliminate the risk, may not be abnormally dangerous if the activity is one of "common usage."

The second Restatement defines common usage as an activity that is "customarily carried on by the great mass of mankind or by many people in the community." (Rest.2d Torts, § 520, com. (i).) The question whether an activity is common or not "is sometimes not so much one of the activity itself as of the manner in which it is carried on." (*Ibid.*) The Restatement itself offers the following contrasting examples: water collected in "a hillside reservoir in the midst of a city" and that in household pipes or a barnyard tank; and large gas storage tanks or high tension power lines versus gas and electricity in household pipes and wires. (*Ibid.*)[7] In very early cases, our Supreme Court determined that blasting was ultrahazardous when carried out in a densely populated area (*Colton* v. *Onderdonk* (1886) 69 Cal. 155 [10 P. 395, 398]; *Munro* v. *Dredging etc. Co.* (1890) 84 Cal. 515 [24 P. 303]) but not in a deserted location. (*Houghton* v. *Loma Prieta Lumber Co.* (1907) 152 Cal. 500, see also, *Smith* v. *Lockheed Propulsion Co., supra,* 247 Cal.App.2d 774, 786.)

In *Luthringer* v. *Moore, supra,* 31 Cal.2d 489, plaintiff was injured by the gas used in fumigating a building. The court considered the question whether use of hydrocyanic acid gas to eliminate cockroaches in a restaurant

---

§ 7.04[1][b], pp. 7-25.) However, many courts have treated the Restatement factors as relevant to a finding that an activity is abnormally dangerous. (*Goodwin* v. *Reilley* (1985) 176 Cal.App.3d 86, 91 [221 Cal.Rptr. 374]; *SKF Farms* v. *Superior Court* (1984) 153 Cal.App.3d 902, 906 [200 Cal.Rptr. 497].) We note, also, that in *Luthringer* v. *Moore* (1948) 31 Cal.2d 489 [190 P.2d 1], the court quoted from the first Restatement of Torts (on what was then denoted "ultrahazardous activity") with approval, and noted in particular that the activity involved in that case was not a matter of common usage. (*Id.,* at p. 500.) We conclude that the Restatement factor of common usage applies under California law.

[7]Although the Restatement Second refers to maintenance of high-tension power lines to illustrate abnormal danger, we find no California case which so holds. (Rest.2d Torts, § 520, com. (i), p. 40.) The *Pierce* court did not discuss this illustration, but merely concluded that the maintenance of high-voltage power lines is not "ultrahazardous." (*Pierce* v. *Pacific Gas & Electric Co., supra,* 166 Cal.App.3d at p. 85.) We discuss the illustration simply to underscore the importance of the manner in which an activity is carried out for purposes of making a determination of common usage.

located in a large commercial building was a matter of common usage. In relevant context, the court stated that the gas "may be used commonly by fumigators, but they are relatively few in number and are engaged in a specialized activity. It is not carried on generally by the public, . . ." (*Id.,* at p. 500.)

 PG&E argues that the activity can nevertheless be considered commonplace even though carried on by relatively few companies. In support of its argument, PG&E relies on cases involving injuries to employees detonating fireworks (*Ramsey* v. *Marutamaya Ogatsu Fireworks Co.* (1977) 72 Cal.App.3d 516 [140 Cal.Rptr. 247]), a skydiving student (*Hulsey* v. *Elsinore Parachute Center* (1985) 168 Cal.App.3d 333 [214 Cal.Rptr. 194]), and an oil refinery worker *(Flanagan* v. *Ethyl Corporation* (3d Cir. 1968) 390 F.2d 30). In *Ramsey,* the court—in dicta—determined that a public fireworks display could be operated safely if the fireworks were not negligently manufactured, while observing that fireworks displays are common "on appropriate occasions such as the Fourth of July." (*Id.,* at pp. 527-528, fn. 2.) Of course, traditional fireworks displays on particular celebratory occasions may be considered common because many people in the community attend or witness such displays. However, such a specific conclusion is not tantamount to a determination that activities common only within one industry are commonplace, but is in general alignment with the Restatement approach that conmon activities are those "carried on by the great mass of mankind or by many people in the community." (Rest.2d Torts, § 520, com. (i).)

Similarly, in *Hulsey* v. *Elsinore Parachute Center, supra,* 168 Cal.App.3d 333, the injured skydiving student argued that his signed release of liability was invalid because skydiving was ultrahazardous. Evidence was presented of the existence of a United States Parachute Association which approved the course of study at issue and certified instructors. While concluding that skydiving was not an uncommon sport, the court noted that if parachutists tended to drop out of control and landed in unwanted places causing harm, the sport may be considered ultrahazardous (*id.,* at pp. 345-346). The court also stated that the risk was assumed by those who chose to engage in the activity, and that such risk of harm could be eliminated by the exercise of due care. Yet nowhere in *Hulsey* is evidence shown or discussed as to the number of participants in the sport of skydiving to support the finding that it was not uncommon. In all likelihood the *Hulsey* dictum regarding the common nature of skydiving rested on the principal fact that a national association existed which certified schools where the public could choose to participate.

In *Flanagan* v. *Ethyl Corporation, supra,* 390 F.2d 30, a worker was killed in a refinery plant explosion while filling a tank truck with oil. His widow

argued that the death was not covered under the Pennsylvania workers' compensation law because the employment was ultrahazardous. The court, in a very brief opinion, determined that the job was not intended to cause explosions and that it is common practice in oil refineries to fill tank trucks with oil. We do not believe that the *Flanagan* holding stands for a general proposition that practices common to one industry are exempt from strict liability scrutiny for carrying on an abnormally dangerous activity. To the contrary, we construe *Flanagan* as appropriately limited to the practices of the relevant employer in a workers' compensation setting.[8]

In *Pierce v. Pacific Gas & Electric Co., supra,* 166 Cal.App.3d 68, the plaintiff was injured when a faulty transformer caused 7,000 volts of electricity to be delivered to her home. (*Id.,* at p. 74.) The court found that maintenance of electric power lines is not "ultrahazardous" because it has become pervasive and "entirely commonplace." (*Id.,* at p. 85.) We believe that the result in *Pierce* is fully compatible with *Luthringer*: although the public does not generally maintain electric power lines, the public customarily uses electricity supplied at home and at work, and high-tension power lines—unlike PCB-containing transformers—are commonly visible on public streets.

Thus, we adhere to the requirements stated in *Luthringer v. Moore, supra,* 31 Cal.2d 489 and the Restatement Second that an activity is a matter of common usage if it "is customarily carried on by the great mass of mankind or by many people in the community." However, we do not mean to suggest that PG&E is strictly liable for every activity unique to it; indeed, *Pierce* readily identifies the situation where the "great mass of mankind" customarily has and uses electricity. (*Pierce v. Pacific Gas & Electric Co., supra,* 166 Cal.App.3d 68.) To reiterate, the question in *this* case is whether it is commonplace and within the experience of the great mass of people in the community that electrical transformers containing a hazardous, toxic substance are located in densely populated commercial locations.

We next proceed to a review of the pleadings and the moving party's showing to determine if a material triable issue exists.[9]

---

[8] Were we to adopt PG&E's view, we would necessarily exempt from strict liability the familiar examples of blasting, crop dusting, and storage of explosives, since each activity is probably quite common within the relevant industry. (See examples of abnormally dangerous activities listed in *Goodwin v. Reilley, supra,* 176 Cal.App.3d 86, 91.)

[9] We note that the determination of whether an activity is abnormally dangerous or ultrahazardous is a legal one. (*SKF Farms v. Superior Court, supra,* 153 Cal.App.3d 902, 906.) However, such determination involves consideration of the Restatement factors, including an evaluation of whether the dangers of the activity are inappropriate for the locality, the magnitude of the risks, and the ultimate policy issue whether the dangers and inappropriateness of the activity are so great as to require the enterprise engaged in the activity to pay for any

The complaint in relevant part alleges the following: (1) PG&E owned, managed, controlled and maintained electrical transformers containing toxic materials including PCB's; (2) the transformers exploded and burned, emitting additional toxic substances; (3) the smoke and soot contaminated plaintiffs' work area; (4) plaintiffs were exposed to the noxious chemicals; and (5) the contamination continued even after plaintiffs were assured that the work area was safe.

In support of its motion, PG&E submitted the declarations of its employees Rod Maslowski and Virgil Rose, and the declaration of Kenneth Linsley, an employee of codefendant Westinghouse Electrical Corporation, and requested judicial notice of portions of the Federal Register. The Maslowski declaration stated in substance that the use of PCB-containing transformers was customary and typical in special grid or "network" systems at the time of the fire, and widely used by PG&E and others at that time. The declaration also concluded that "PCB's were widely used throughout the utility industry due to their excellent insulation capabilities and low potential for flammability." The Rose declaration echoes the same opinion stating the transformers were commonly used to maintain a reliable supply of electricity. The Linsley declaration attests to personal knowledge that PCB's were commonly used in transformers since 1967, and that Westinghouse had manufactured "thousands" of such transformers for sale to utilities and other agencies.

Upon closer examination, these declarations amount to no more than the stated conclusions of the parties' employees. The pivotal criteria of common usage is described in ipse dixit form. Yet the determination of what constitutes "common usage" is a conclusion of law for the court alone. Moreover, neither legal nor factual conclusions are sufficient to satisfy the requirements of the statutory summary judgment procedure. (*Wiler* v. *Firestone Tire & Rubber Co., supra,* 95 Cal.App.3d 621, 626; cf. *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 311-312 [118 Cal.Rptr. 473, 530 P.2d 161], fn. 8 [self-interest inherent in employee declaration removes impartiality necessary to justify judicial reliance].) Although the Linsley declaration professes personal knowledge that PCB's were common since 1967, no probative reference to 1983 is made. That "thousands" of PCB transformers were manufactured provides no adequate foundation to conclude that the transformers are common, without meaningful comparison to the number and location of the transformers that did not contain PCB's. To say, for example, that thousands of sticks of dynamite exist would not, quite

harm it causes, despite any usefulness to the community. (*Ibid.*) For these reasons, the issue of ultrahazardous activity may not be determined on a demurrer. (*Ibid.*) The issue might properly be reached on summary judgment, but only where the moving party is able to nullify the existence of a material factual issue.

obviously, address the issue whether dynamite blasting might be ultrahazardous in specified instances.[10]

PG&E and amicus curiae, Chemical Manufacturers Association (CMA), point to statements of the Environmental Protection Agency (EPA) in the Federal Register that the use of PCB transformers for the rest of their useful lives did not present an unreasonable risk to public health or the environment. (50 Fed.Reg. 29170-29171, 29195 (July 17, 1985).)[11]

However, in 1982 (the year before the fire), the EPA stated that PCB's "are toxic and persistent." (47 Fed.Reg. 37344 (Aug. 25, 1982).) The agency discussed the potentially adverse health effects caused by PCB's, listing chloracne, reproductive effects, developmental toxicity, and oncogenicity. (*Ibid.*) We note that the process used by the EPA in making its ultimate determination allowing continued regulated use of PCB transformers involved a balancing of the probability that harm will result from use of PCB's against the attendant benefits and the economic impact of regulating or prohibiting continued use of the substance. (*Env. Def. Fund* v. *Env. Prot. Agency, supra,* 636 F.2d 1267, 1275-1277; 47 Fed.Reg. 17430 (Apr. 22, 1982).) The EPA's statements discounting unreasonable risks were expressly grounded on the fact that an immediate ban would cost the public and industry billions of dollars. (50 Fed.Reg. 29170 (July 17, 1985).) Clearly, in permitting continued use, the EPA did not arrive at a determination that

---

[10] Of course, the significance of the manufacture of thousands of PCB transformers is diminished when one considers that there are tens of millions of transformers in use in this country. (47 Fed.Reg. 37345 (Aug. 25, 1982).) Similar neglect of the surrounding circumstances is apparent in the declaration of Thomas Milby, M.D., to the effect that 1.25 billion pounds of PCB's were manufactured in the United States since the late 1920's.

[11] Parenthetically, we observe that the federal regulations distinguish between PCB transformers (containing more than 500 ppm PCB's under the EPA definition) and mineral oil transformers which have been contaminated with PCB's during manufacturing and servicing. (*United States* v. *Com. Edison Co.* (N.D.Ill. 1985) 620 F.Supp. 1404, 1406.) In the *Com. Edison Co.* case, the Illinois federal district court noted that a small percentage of transformers are PCB transformers. (*Id.,* at p. 1407.) PCB-contaminated mineral oil transformers account for only a small percentage of the PCB's released into the environment. (*Ibid.*) The EPA characterizes different levels of PCB contamination of transformers and treats the different types of transformers in different manners. (40 C.F.R. § 761.30 (1986).) PG&E has admitted that the transformer involved in this case was a "PCB transformer" that contained the highest level of PCB's under the EPA definition. The EPA has stated that the transformer involved in this case was a 480-volt network transformer, a type of transformer that has a "particularly high probability of failure." (50 Fed.Reg. 29180 (July 17, 1987).) Interestingly, the EPA estimated that in 1981 there were 39,600 utility PCB transformers and 91,600 in all other industries, while there were some 25 million mineral oil transformers in use nationwide. (47 Fed.Reg. 37345 (Aug. 25, 1982).) Thus, PCB transformers would account for approximately one-half of one percent of the transformers in use in 1981. "[T]ransformers designed to contain PCB's are more restricted in their distribution than other transformers." (47 Fed.Reg. 37345 (Aug. 25, 1982).) Thus, it appears that in 1981, PCB transformers constituted but a fraction of the number of electrical transformers in use in this country, a circumstance patently demonstrating a material triable issue.

PCB's are functionally safe, but rather engaged in a cost-benefit analysis for the purpose of deciding whether to regulate or prohibit the activity. The agency elected to regulate an activity involving a known toxic substance, a decidedly different question from that presented in determining whether an activity is abnormally dangerous. Even though an activity has some utility, it is for the court to decide that its unusual danger requires, as a matter of policy, that the business engaged in the activity assume the cost for the harm the activity causes. (Rest.2d Torts, § 520, com. (f).)

 We note, in addition, that the EPA later qualified its statement regarding the health risk of PCB's as follows: "At the time of promulgation of the August 25, 1982 PCB Electrical Use Rule, EPA believed that PCB Transformer fires were very rare, isolated events." (50 Fed.Reg. 29171 (July 17, 1985).) In fact, after receiving public comment on the issue, the EPA stated: "On October 11, 1984, EPA issued a Proposed Rule which contained EPA's determination that PCB Transformer fires (fires involving transformers containing greater than 500 ppm. PCB's), *particularly fires which occur in or near buildings, do present risks to human health and the environment.* EPA reached this determination after considering the extreme toxicity of materials which can be formed and released during fires involving this equipment . . . ." (*Id.,* at p. 29172, italics added.) This concern resulted in a ban on the use of the type of PCB transformer at issue in this case in or near commercial buildings after October 1, 1990. (*Ibid.*) The EPA found: "Network PCB Transformers are currently the least well-protected against high current faults of all distribution class PCB Transformers in use." (*Id.,* at p. 29178.) Thus, the references to the earlier EPA statement have little relevance, if any, to the dangers presented when PCB-containing transformers are involved in fires.

Amicus curiae, the Utilities Solid Waste Activities Group (USWAG), likewise argues that PCB-containing transformers are commonly used, citing its own 1981 inventory reflecting nearly 40,000 such transformers in use in the utility industry. While arguably relevant, these evidentiary facts were not submitted to the trial court. The EPA had analyzed this information and stated: "A total of 6 out of 10 known PCB Transformer fires have occurred in higher secondary voltage network PCB Transformers (in 480 volt network installations). This is particularly dramatic when one considers that there are only an estimated 7,800 480 volt network PCB Transformers in use." (50 Fed.Reg. 29180 (July 17, 1985).) Although we do not suggest that the activity at issue necessarily must be analyzed separately for each type of PCB transformer, we direct attention to EPA's statement merely to indicate that the full dimensions of the issue were not considered before the ultimate conclusion of "common usage" was reached.

The materials submitted by petitioners included a transcript of the Maslowski deposition indicating the presence of 839 PCB transformers in downtown San Francisco in 1983 as well as PG&E's earlier plan to replace certain downtown PCB transformers with non-PCB transformers. Such testimony provides little guidance on the issue of common usage. But though petitioners offered little to preserve the existence of a disputed fact on the crucial issue of common usage, the materials submitted by PG&E, rather than negating the existence of a factual dispute, served to illuminate it.

Upon full examination of the detailed materials submitted by PG&E, we are impelled to conclude that disputed issues of material fact exist regarding whether the use of PCB-containing transformers near downtown office buildings is or has been actually experienced by many people in the community. The cumulative information contained in the federal materials submitted by PG&E persuasively indicates that a triable issue of material fact remains to be heard and determined by the factfinder.

We conclude that it was error to grant summary adjudication of issues as to the ultrahazardous activity issue by reason of the material issues of fact regarding the common usage question remaining to be tried. In addition, although such issue may ultimately be determinative, it cannot be decided in a vacuum. The court must consider the totality of the surrounding circumstances, rather than merely accepting the bald assurance of the utility or the industry that this type of transformer is of common usage. While the common nature of some activities may be an appropriate subject of judicial notice, the frequency of use of underground PCB-containing transformers in a central urban setting is not one of them. Upon remand, the trial court will have the opportunity to hear and consider the evidence regarding the factors listed in section 520 of the Restatement Second in making a determination as to the issue of ultrahazardous activity.[12]

---

[12] We reject amicus curiae CMA's argument to affirm the trial court's order by finding that PCB's do not present an unreasonable risk of harm to public health, another crucial element of the ultrahazardous-activity analysis. (See, Rest.2d Torts, § 520; *Luthringer* v. *Moore, supra,* 31 Cal.2d 489.) Although the trial court informally rejected this claim, and PG&E appears to have conceded the issue herein, we have examined the materials submitted by CMA and found them insufficient. In support of their claim, CMA cites the previously discussed EPA statement, and four studies which were *not* presented to the trial court, namely: (1) a report by three toxicology consultants hired by CMA; (2) an article by R.D. Kimbrough critical of studies which found a relationship between PCB's and cancer or other diseases; (3) a study of residents of New Bedford, Massachusetts, who consumed PCB-contaminated fish, which found no correlation between low and moderate blood serum levels of PCB's and high blood pressure; and (4) a study of New York workers exposed to PCB contamination from the Hudson River, which found no excessive cancer rates. We note that none of these documents make any reference to the effects of polychlorinated dibenzofurans (PCDF), one of the products produced when PCB's burn, which are referenced in the complaint below as "other noxious chemicals." One of the studies notes: "Studies in animals have clearly indicated that

*PG&E Conspiracy Involvement*

The second issue determined to be without substantial controversy was that PG&E was not involved in any conspiracy to misrepresent or suppress information concerning testing, cleaning or decontamination efforts subsequent to the fire as alleged in the complaint as amended.

■ The gravamen of a cause of action for civil conspiracy consists of " '(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts.' [Citations.]" (*Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 77 [154 Cal.Rptr. 43].) As to the first element, "a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose. [Citation.] Furthermore, the requisite concurrence and knowledge ' " 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' [Citation.] Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator. [Citation.]" (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 784-785 [157 Cal.Rptr. 392, 598 P.2d 45].)

■ Once again, PG&E relies upon the Maslowski and Rose declarations to support its argument denying involvement in a conspiracy. The Maslowski declaration states that he and Rose are "the most knowledgeable persons at PG&E concerning the aftermath and the clean-up process at One Market Plaza building following the May 15, 1983 fire." Maslowski further states that "PG&E made no agreement with any other entity or individual to represent to plaintiffs whether particular areas of the building were clean or not clean. Moreover, PG&E had no knowledge of any such agreement between or among any other entities or individuals. Neither the committee nor PG&E had any plans to deceive the plaintiffs."

The Rose declaration contains similar statements of paramount knowledge and exculpatory noninvolvement of PG&E. PG&E argues that, in light of such declarations refuting the conspiracy issue, petitioners failed to present any competent evidence that a conspiracy existed.

Assuming, arguendo, that the supporting declarations prima facie refute the claimed existence of the essential elements of knowledge and express

PCDFs are more toxic than PCBs, and a number of lines of evidence support the contention that the adverse health effects suffered by the rice oil (contaminated with PCB's) poisoning victims were a result of PCDF rather than PCB exposure." (Harbison, James and Roberts, *Biological Data Relevant to the Evaluation of Carcinogenic Risk to Humans* (U.Ark.Sch. Med., Aug. 1987) p. 19.) Far from assuring that this issue is appropriate for summary judgment, the materials submitted by CMA serve to corroborate our conclusion that material factual disputes exist regarding the question whether the toxic products at issue present an unreasonable risk of harm.

consent, we turn to the evidence presented by petitioners to establish the existence of such material issues. (*Stalnaker* v. *Boeing Co.* (1986) 186 Cal.App.3d 1291, 1297 [231 Cal.Rptr. 323].)

Petitioners presented deposition transcripts of plaintiff James Brown, and Kip Porter, an employee of I.T. Corporation—the company employed by PG&E to carry out cleanup operations. Brown stated that he asked I.T. Corporation, building management, the testing company, and PG&E personnel for data regarding the safety of the building, which information was deliberately withheld to induce him to return to work in the contaminated area. Porter declared that after a conference between PG&E and I.T. personnel, all types of PCB's originally present were no longer reported on the computer printouts. Maslowski and I.T. management instructed I.T. employees not to wear protective clothing when working outside the building in public view. Porter, who had building employees working along with him, stated he was instructed not to utilize protective clothing. Maslowski is reported to have informed I.T. personnel not to take samples from one of the two affected towers in the building; and I.T. management so instructed its employees.

PG&E objected to these statements below as hearsay, although it appears that only the two extrajudicial statements attributed to Maslowski were offered to prove the matter stated. (Evid. Code, § 1200.) But the statements appear to relate to the very acts and declarations constituting the alleged conspiracy agreement between I.T. and PG&E to suppress information and to produce inaccurate decontamination testing results. ▮ Acts, declarations, and omissions of conspirators which form a part of the charged conspiracy are *not* hearsay. (*People* v. *Curtis* (1951) 106 Cal.App.2d 321, 325-326 [235 P.2d 51]; 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 588, 592, pp. 561, 564-566.) ▮ Thus, even if PG&E's initial showing was sufficient to require petitioners to present competent evidence supporting the existence of a triable issue, such evidence was presented which directly contradicted Maslowski's statements denying PG&E's knowledge of or participation in a conspiracy to suppress information. In such circumstances, it was error to order summary adjudication of this factually contested issue.

### PG&E Involvement in Tissue and Blood Sampling

▮ The final issue determined to be without substantial controversy was PG&E's noninvolvement in the tissue and blood sampling as alleged in the ninth cause of action. Summary adjudication again rested on the declarations of Maslowski and Rose.[13] Maslowski stated that PG&E had no

---

[13] The Rose declaration was based only on "the best of my knowledge," and, therefore, insufficient to establish the personal knowledge required by section 437c. (*Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, 719-720 [136 Cal.Rptr. 871].)

participation in the tissue and blood sampling, and had no "knowledge of the purpose underlying the tests or of the specific contaminants which were to be tested for."

In granting summary adjudication of this issue, the trial court stated that the only opposition offered by petitioners was a page from the diary of a Versar officer produced during discovery.[14] Maslowski's declaration negated the element of PG&E's knowledge of the purpose of the questioned testing. Petitioners may not, of course, rely on their own pleadings to raise a triable issue of fact. (*Kallen v. Delug* (1984) 157 Cal.App.3d 940, 948 [203 Cal.Rptr. 879].) The equivocal scribbled notation in the Versar officer's notes does not constitute " ' "sufficient proof of the matters alleged to raise an issuable question of fact" ' . . . . [Citation.]" (*Ibid.*) We conclude, therefore, that the order of summary adjudication as to this issue was free from error.

### Disposition

Let a peremptory writ of mandate issue, commanding respondent superior court to set aside its order of April 30, 1987, as to the first and second issues, and to enter a new order denying the motion as to the issues of abnormally dangerous activity and civil conspiracy. Petitioners shall recover their costs.

Newsom, J., and Holmdahl, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 6, 1988. Panelli, J., did not participate therein.

---

[14] The paper contained the notation: "T. Milby—PGE—desire to set up med surveillance (and IH program) with Chase/GR."